**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| KINGSTOWN CAPITAL MANAGEMENT, L.P., KINGSTOWN PARTNERS MASTER LTD., KINGSTOWN PARTNERS II, L.P., KTOWN, LP, KINGFISHERS, LP, KINGSTOWN 1740 FUND LP, and KINGSTOWN CAPITAL PARTNERS LLC | **Case No. _____** |
| | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| DAVID DICKSON and STUART SPENCE, | |
| Defendants. | |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ........................................................................... 1

II.    JURISDICTION AND VENUE ..................................................................... 16

III.   PARTIES ...................................................................................................... 16

IV.    SUBSTANTIVE ALLEGATIONS ............................................................... 19

       A.    McDermott's Business & Operations ................................................ 19

       B.    CB&I's Business & Operations ......................................................... 20

       C.    Defendants Cause McDermott to Issue a Series of False and Fraudulent
             Statements Regarding Its Acquisition of CB&I................................. 24

       D.    Every Aspect of the Defendants' Disclosures Regarding CB&I and the Merger
             Was Permeated by Fraud .................................................................. 51

             1.    The Fraudulent Claims Regarding the Adequacy of Due Diligence ........ 52

             2.    The CB&I/Focus Project Fraud, Undisclosed Costs, and the Technology
                   Business .................................................................................... 53

             3.    The Capital Structure and Liquidity Fraud ............................................. 56

       E.    Post-Merger Misstatements & Omissions ......................................... 57

             1.    The Post-Merger Statements Concerning McDermott's Overstated Due
                   Diligence Efforts ............................................................................ 57

             2.    The Post-Merger Statements Concerning the Focus Projects' Forecasted
                   Costs ........................................................................................... 59

             3.    The Post-Merger Statements Concerning the Technology Business ........ 73

             4.    The Post-Merger Statements Concerning The Capital Structure/Liquidity
                   Fraud ........................................................................................... 84

             5.    Partial Corrective Disclosures Incrementally Revealed The Frauds ........ 95

       F.    Additional Facts Probative Of Scienter ........................................... 107

             1.    Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates
                   Scienter ...................................................................................... 107

                   a.    McDermott's Claimed Pre-Announcement Due Diligence ........ 107

                   b.    McDermott's Post-Announcement Misstatements Regarding Due
                         Diligence ............................................................................ 108

                   c.    Additional Red Flags Around The Time Of The Merger .......... 110

                   d.    With Defendants Dickson And Spence At The Helm, McDermott
                         Knowingly Continued Improprieties After The Merger ............. 111

             2.    McDermott Raised Funds During The Fraud Period ............................. 112

i

        3.      The Fraud Implicated Core Operations.................................................... 113

        4.      The Fraud Violated McDermott's Corporate Code of Conduct ............ 116

V.     NO SAFE HARBOR ...............................................................................117

VI.    THE CLAIMS ARE TIMELY.................................................................119

VII.   LOSS CAUSATION/ECONOMIC LOSS ..............................................119

VIII.  PRESUMPTION OF RELIANCE ..........................................................121

IX.    PLAINTIFFS' ALLEGATIONS .............................................................122

X.     CLAIMS FOR RELIEF .........................................................................122

      COUNT I ...............................................................................................122

      COUNT II ..............................................................................................126

XI.    PRAYER FOR RELIEF .........................................................................127

XII.   DEMAND FOR TRIAL BY JURY ........................................................128

Kingstown Partners Master Ltd., Kingstown Partners II L.P., Ktown LP, Kingfishers, LP, Kingstown 1740 Fund LP, Kingstown Capital Management, LP and Kingstown Capital Partners, LLC (collectively, "Plaintiffs"), for their Complaint against David Dickson and Stuart Spence ("Defendants"), allege the following based upon personal knowledge as to themselves, and information and belief as to all other matters.

## I.    NATURE OF THE ACTION

1.      This is an action brought by Plaintiffs, entities who purchased common stock or notes of McDermott International, Inc. ("McDermott") (NYSE: MDR), seeking to pursue remedies against David Dickson, the President and Chief Executive Officer of McDermott ("Dickson") and Stuart Spence, McDermott's former Chief Financial Officer ("Spence"), for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.[1]  Plaintiffs have suffered damages in excess of $100 million as a result of Defendants' misconduct.

2.      During in person meetings by Plaintiffs and Defendants and a series of direct communications with Defendants, in McDermott's press releases, SEC filings, and teleconferences with analysts and investors, Defendants made, or were responsible for the making, of extensive false and misleading statements about McDermott's May 2018 acquisition of Chicago Bridge & Iron Company, N.V. ("CB&I"). These statements concerned (a) four large CB&I projects in the U.S. ("Four Focus Projects" or "Focus Projects") acquired as part of the transaction, consisting of two gas turbine projects known as the Calpine Gas Turbine Power Project ("Calpine") and the IPL Project ("IPL"), and two liquefied natural gas ("LNG") export facility projects known as the Freeport LNG Project ("Freeport") and the Cameron LNG Project

---

[1] Plaintiffs' allegations set forth below, to the extent not alleged on personal knowledge, either rely on (i) information and belief or (ii) certain allegations set forth in the currently pending class action lawsuit against Defendants in the Southern District of Texas (*see Edwards v. McDermott International, Inc. et al*, 18-cv-04330).

("Cameron"); (b) the importance of McDermott's acquisition of CB&I's technology business, Lummus ("Technology Business" or "Lummus"), and McDermott's ability to integrate and operate that business as a post-Merger company despite the challenges posed by the Four Focus Projects; and (c) the strength and viability of McDermott's post-Merger capital structure, balance sheet, liquidity, and financial health in light of its acquisition of CB&I, and specifically the Four Focus Projects.

3.      The crux of Defendants' fraud was to knowingly misrepresent to investors, including Plaintiffs, that McDermott had conducted extensive and comprehensive due diligence regarding CB&I prior to the Merger and fully understood all of CB&I's assets, project risks and cost forecasts, including with respect to the Four Focus Projects, when in fact McDermott had recklessly failed to do so. After the acquisition of CB&I, Defendants double-downed on their fraud, and as McDermott's performance plummeted due to the Four Focus Projects, concealed from investors, including Plaintiffs, that the cost overruns for the Four Focus Projects were completely out of control and otherwise misled investors, including Plaintiffs, regarding various material aspects of McDermott's operation of CB&I, and McDermott's financial condition. Plaintiffs met with Defendants on multiple occasions, both in person and in investor meetings, during which Defendants Spence and Dickson lied to Plaintiffs about Defendants' due diligence prior to the Merger and performance of McDermott after the Merger.  At the time, Defendants knew that Plaintiffs had become among McDermott's larger investors, and affirmatively misled Plaintiffs to induce them to continue to invest in McDermott and to conceal discovery of the fraud being perpetrated by them.

4.      As alleged below, Defendants' fraud permeated every aspect of the disclosures regarding McDermott's acquisition of CB&I.

5.     Early on April 12, 2018, as part of the NYSE proxy solicitation process, CB&I issued a press release reporting preliminary first quarter 2018 financial results. The press release reported a range of operating results that CB&I "expect[ed] to report." The press release reported that CB&I did not incur any material project changes to the Focus Projects in the first quarter 2018 and stated that CB&I's preliminary results reflect:

> ***Excellent operating performance across the company's portfolio of projects***, including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project, which respectively reached 84%, 82% and 84% completion and incurred no material project changes during the quarter.

6.     On April 12, 2018, as part of the proxy solicitation process, McDermott provided its shareholders with an operational update for the quarter ended March 31, 2018, and reaffirmed its 2018 guidance originally issued on January 24, 2018, as previously reaffirmed on February 21, 2018.

7.     Analysts viewed CB&I's quarterly results reflecting no charges to the Focus Projects positively and as supportive of the Merger. Credit Suisse wrote in an April 12, 2018 analyst report titled "MDR-CBI Preannounce: Working Miracles," that "A clean quarter from CBI and a beat from MDR is a positive surprise and certainly timely given concerns the deal was at risk." In another analyst report issued on April 12, 2018, Deutsche Bank stated: "we are encouraged that the MDR/CBI merger story has somewhat de-risked" and noted that the Focus Projects were now "under control." Similarly, an April 17, 2018 analyst report stated that: "CB&I also released a PW on April 12th, which included no one-off charges on its four focus projects, which is a positive indicator for ongoing execution risk."

8.     On April 16, 2018, Defendants caused McDermott to issue a letter to shareholders that was filed with the SEC pursuant to Rule 425 and was part of the proxy solicitation process.

9.  Defendants caused McDermott to assure investors as to its ongoing due diligence and the benefits of the Merger:

> We believe that, together, McDermott and CB&I will span the entire value chain from concept to commissioning, **deliver compelling value,** be more competitive and **deliver more consistent, predictable performance** through market cycles.
>
> In addition to being underpinned by a compelling strategic rationale, **the combination is also expected to deliver substantial financial benefits for stockholders.** Together, McDermott and CB&I will have significantly enhanced backlog and pro forma combined revenues, adjusted EBITDA and adjusted net income. The companies have reaffirmed the anticipated $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019, and have identified potential incremental savings of $100 million.

10.  On April 23, 2018, prior to the opening of trading, CB&I issued a press release announcing financial results for the first quarter of 2018. CB&I reported a 78 percent increase in net income versus the year-ago quarter, including "[s]olid operating performance in Fabrication Services, Technology, and E&C Groups, including no material charges on Cameron LNG, Freeport LNG and Calpine power projects." CB&I did not hold a first quarter earnings conference call, it stated, "due to [the] pending combination with McDermott."

11.  The Form 10-Q filed by CB&I on April 24, 2018, included a discussion of the Cameron Project, which noted that "[t]he project was approximately 84% complete and had a reserve for estimated losses of approximately [$13 million] at March 31, 2018."

12.  On April 24, 2018, McDermott issued a press release reporting first quarter 2018 operating results attached to a Form 8-K signed by Defendant Spence and filed with the SEC. The headline of the press release read: "Strong Start to 2018 Driven by One McDermott Way." With respect to the proposed acquisition of CB&I, the press release added that the parties had identified an additional $100 million of synergies anticipated from the Merger.

13.  In the same Form 8-K, Defendants caused to be included a presentation titled "Q1 2018 Supplemental Information." On a slide titled "Post-Combination Synergies Identified," the

4

presentation stated that there are $350 million in total synergies, with $153 million in the supply chain, $93 million in G&A, $77 million in operations, and $27 million in other cost-cutting measures.



14.     Also on April 24, 2018, Defendants conducted a conference call with investors to discuss the first quarter operating results. On the call, Defendant Dickson misled investors about why he was opposed to McDermott being acquired by a competitor and instead emphasized that McDermott's Board had rejected Subsea 7 S.A.'s ("Subsea 7") acquisition offer, which offered to acquire McDermott at a substantial premium (and was prepared to offer more),  because the CB&I Merger allegedly presented a more "attractive alternative":

> This highly conditional proposal was subject to amongst other things, the termination of our combination with CB&I. McDermott's board carefully reviewed and considered the proposal in consultation with its outside financial advisors and legal counsel. The board concluded that the proposal was not in the best interest of the company or its stockholders as it significantly undervalued McDermott and was not an attractive alternative to our pending combination with CB&I.

*   *   *

5

> *We're very confident of the combination* and we're going to continue on the same path.

15.    Dickson also stated on the conference call that since the December 2017 announcement of the Merger, the parties had worked closely together and that "[t]ogether, we can provide certainty, innovation and added-value to energy projects around the world:"

> *We have spent a great deal of time with CB&I since we initiated this effort last summer and are more enthusiastic than ever about the opportunities this combination will offer to our customers.* Together, we can provide certainty, innovation and added-value to energy projects around the world. And together, our complementary market positions and geographical footprint will create new opportunities for revenue growth and we will be more competitive and better able to deliver consistent predictable performance through market cycles.

> *As we've gotten to know CB&I better over the last 10 months*, we've seen first-hand, how this company values quality, innovation, safety and its employees, and more importantly, we have witnessed how it puts customers first. That is why coming together makes sense, and we are really excited about what's next.

16.    With respect to CB&I's long-term construction contracts, Dickson made false assurances that McDermott, through its due diligence, had mitigated the risk to McDermott:

> We also note that CB&I reported results for Q1 2018 yesterday. CB&I reported excellent operating performance across its portfolio of projects *including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project*

> These projects respectively reached 84%, 82% and 84% completion and incurred no material project charges during the quarter. Through our integration planning process, *we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio.*

These statements indicated Defendants' familiarity and comfort with the degree of completion on the Focus Projects and, therefore, the costs incurred and to be incurred in completing the Focus Projects.

17.    When asked about the Freeport Project, Dickson gave false assurances to investors: "That was all known as we went through the due diligence and it's all subject to insurance, it is a

6

force majeure situation and CB&I are working with the customer getting through that, but all in all, I would again emphasize that in our view, *Freeport is a good project*."

18.     The false picture painted for analysts and investors was one of a strong company, having conducted extensive due diligence, capitalizing on a discounted acquisition of a complementary peer and seamlessly integrating its most significant projects and assets, for which it had appropriately accounted.  Defendants made precisely the same false representations to Plaintiffs in meetings Defendants held with Plaintiffs.

19.     Many of Defendants' actions and statements detailed herein concerning McDermott's  May 2018 acquisition of CB&I (both pre-, during, and post-Merger) stem from a common scheme and motive: Defendants sought, at all costs, to avoid McDermott itself being taken over, either  by Subsea 7, one of its competitors, or by another company.  Prior to the Merger, Subsea 7 had offered to acquire McDermott at a substantial premium over market.  A Subsea 7 takeover, although benefitting shareholders, would likely would have ultimately led to Dickson's and Spence's termination as officers of McDermott. To avoid the loss of their highly compensated positions, Defendants executed a fundamentally risky merger with CB&I, and falsely obscured, *inter alia*, the level of due diligence in which McDermott engaged when reviewing CB&I's assets before the Merger closed.  Once the Merger was completed, Defendants hid McDermott's resulting liquidity problems and the overall health of McDermott's balance sheet post-Merger.

20.     Specifically, Defendants consistently down-played the risks of the Four Focus Projects, and as set forth below, falsely represented to both Plaintiffs and other investors the extent of McDermott's due diligence in connection with the proposed acquisition of CB&I.  For instance, Defendants falsely stated in a January 1, 2018 presentation and a March 22, 2018 presentation, that the "Four focus projects have been *significantly de-risked* with respect to engineering,

quantities and procurement." They went on to misleadingly say, in the same two presentations,

"We believe the four focus projects are not representative of the entire portfolio and have unique

characteristics that will continue to be *de-risked* significantly in 2018." During a February 21,

2018 Earnings Call, referencing CB&I's having disclosed over $100 million of Q4 2017 operating

charges related to the Four Focus Projects, Defendant Dickson falsely reassured investors that the

situation was expected and under control, and said:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional charges attributable to the Four Focused Projects. *The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.*

21.     Also, during an April 24, 2018 conference call, after having rejected a bid from

offshore competitor Subsea 7 to acquire McDermott as "not an attractive alternative to the

proposed combination with CB&I," Defendant Dickson falsely assured investors, including

Plaintiffs, that McDermott, through its claimed due diligence, had mitigated the risk to McDermott

of CB&I's Focus Project contacts, and stated:

> These projects respectively reached 84%, 82% and 84% completion and incurred *no material project charges* during the quarter. Through our integration planning process, *we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three [sic] projects and to continue to execute successfully on the broader portfolio.*

22.     Defendants concealed the true risks of merging with CB&I, rather than acquiring

solely the Technology Business. Defendants deceived investors, including Plaintiffs, by

concealing that CB&I's Technology Business was the key valuable asset of CB&I, that

McDermott had contemplated acquiring just the Technology Business for a comparable price as it

paid for the whole company, and that the Four Focus Projects were an albatross on the Technology

Business and, if acquired, McDermott's entire operations. . In a December 18, 2017 press release

McDermott filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, Defendant

Dickson was quoted as stating, *inter alia*:

> This transaction combines *two highly complementary businesses* to create a leading onshore-offshore EPCI company *driven by technology and innovation,* with the scale and diversification to better capitalize on global growth opportunities

23.    McDermott concealed that being saddled with CB&I projects that made the

transaction far less desirable than the way in which it was being presented, with the Technology

Business front and center, and the downside elements explained away in a misleading manner,

underestimating the true risks and costs involved.

24.    Defendants' insistence that, post-Merger, McDermott would maintain a sustainable

capital structure, made even as McDermott headed into an undisclosed liquidity crisis due to the

immensely under-estimated costs of the Four Focus Projects, also constituted fraudulent conduct.

From before the Merger closed, the Proxy Statement said, *"After the Combination, McDermott

expects to have a strong capital structure."* After the Merger, Defendants represented to investors,

including Plaintiffs, that McDermott's cash and cash equivalents, cash flows, credit facilities, lines

of credit, and non-core assets sales would be sufficient to finance capital expenditures, settle

commitments and contingencies, and address working capital needs. These representations were

false, as McDermott was in fact on a path to crisis, leading to the need to unload core assets and

seek emergency loans soon after acquiring CB&I.

25.    Unbeknownst to investors, including Plaintiffs, upon information and belief, CB&I

had been misrepresenting the true costs of and risks to the Focus Projects by engaging in "rampant

corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to

stakeholders of the company." During the period when McDermott conducted its claimed pre-

Merger due diligence, it was already internally apparent at CB&I that the Four Focus Projects were

gravely behind schedule and over budget and, as such, would vastly underperform their contracts.

Upon information and belief, by February or March 2017, Cameron was already $300 million over budget and that CB&I company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. Upon information and belief, by November 2017, Cameron was $1 billion over budget, if not more, and significantly behind the delivery date. In 2017, the individual in charge of CB&I Project Controls for the Americas segment was demoted and then fired after raising the issue all the way up to the company President in 2016. Upon information and belief, Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, upon information and belief, forecasted costs exceeded then-currently reported costs by *well over $1 billion,* as demonstrated by internal CB&I documents, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.

26.    Notwithstanding the foregoing, Defendants falsely maintained that McDermott's due diligence into the Focus Projects had been thorough and extensive. But this could not be further from the truth. Prior to and after announcing the proposed Merger on December 18, 2017, McDermott failed to conduct proper due diligence.  McDermott could not have fully appreciated the full scope of the issues plaguing each of the Focus Projects during the truncated due diligence period preceding the Merger. The first meeting between McDermott and CB&I management occurred on July 25, 2017, which was essentially an introductory meeting where "no specific transaction terms were discussed." An NDA was first signed on August 17, 2017, after which formal due diligence would have begun. Acting in haste, shortly after management teams of McDermott and CB&I first met for initial due diligence, McDermott sent CB&I a non-binding proposal for a combination of the two companies. Notwithstanding its failure to conduct adequate due diligence, McDermott went on to close the Merger with CB&I on May 10, 2018 while

Defendants falsely reassured investors that McDermott had extensively investigated its Merger target.

27.    However, notwithstanding the story that had been pitched to investors that McDermott had done "extensive" due diligence, when reflecting on the extent of McDermott's due diligence in August 2019 (while McDermott was in freefall toward bankruptcy), McDermott's Chairman admitted that an unfortunate aspect of the McDermott-CB&I deal was, at least with respect to the Technology Business, that there was an inappropriately short period of time to complete diligence, and that the only way for CB&I to survive pressure from its lenders was to sell its Technology Business, leading to a situation in which McDermott was forced to conduct abbreviated due diligence for a transaction of this size and complexity.

28.    Indeed, lingering concerns about the risks of McDermott taking over CB&I and the Four Focus Projects were enough that one member of McDermott's Board of Directors, Stephen G. Hanks, took the step of voting against the Merger, based on his lengthy experience in the engineering and construction industry. However, Defendants drowned out Hanks concerns, claiming that they had sufficiently mitigated the risks that this Director identified through McDermott's due diligence of CB&I.  After the Merger, Mr. Hanks resigned from McDermott's Board of Directors.

29.    On October 30, 2018 (six months after the Merger closed) McDermott issued a press release announcing its Q3 2018 financial results, in which McDermott began to disclose material post-Merger adjustments, but continued to conceal its fraudulent conduct: McDermott disclosed that it was recording *$744 million* total in changed estimates to the Calpine LNG project, the Freeport LNG Project, and the Calpine gas power project. McDermott also disclosed that to address performance issues on those projects, it was taking "significant steps" including

installation of a new Chief Operating Officer ("COO"), and that having completed a strategic review, McDermott had determined the tank storage business and U.S. pipe fabrication business to be "not core to our vertical integration," and developed plans to exit those markets and to seek buyers for those segments. On this news, McDermott's stock price fell $5.14, on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.

30.     Yet, Defendants continued to mislead analysts and investors, including Plaintiffs. The October 30, 2018 press release itself falsely stated, "***We expect no further material changes in the cost estimates on these projects.***" In an earnings call that same day, Defendant Dickson falsely said "***[W]e expect no further material changes in the cost estimates on the legacy Focus Projects, which we believe have been significantly and incrementally de-risked*** as compared to where we were in Q2 [2018].**"** McDermott's Form 10-Q for Q3 2018, filed with the SEC the same day, touted the success of the acquired technology segment, while failing to disclose the full brunt of the downside created by other acquired CB&I assets. The 10-Q filing also contained a false and misleading statement about McDermott's financial situation:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit, together with the expected proceeds for the Private Placement, ***will be sufficient to finance our capital expenditures... settle our commitments and contingencies... and address our normal, anticipated working capital needs for the foreseeable future.***

31.     However, on February 13, 2019, McDermott issued a press release, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, "commenting on its assessment of the financial position of the Cameron LNG project as of December 31, 2018." It stated that for the fourth quarter of 2018, McDermott was recording another ***$168 million*** in adverse changed estimates, purportedly due to unfavorable labor productivity and increases in subcontract, commissioning and construction management costs, which impacted McDermott's

reported financials for the three months and year ended December 31, 2018. On this news, McDermott's stock price fell $2.48, on extremely high volume, from its February 12, 2019 closing price of $9.30 to close at $6.82 on February 13, 2019.

32.    In June 2019, Kingstown urged McDermott's management group to consider exploring structures for the potential sale of its Lummus Technology Business in order to improve McDermott's liquidity. Unconcerned, Defendant Dickson misleadingly re-emphasized, consistent with McDermott's false messaging on this issue, that McDermott did *not* have any liquidity concerns and that the Lummus Technology Business remained a valuable asset, and concealed that McDermott was struggling to pay its vendors. Mere weeks after this meeting *McDermott began delaying payments to its vendors, and subsequently ceased making such payments entirely, facts that* Kingstown did not learn until after McDermott's bankruptcy.

33.    On July 29, 2019, McDermott issued an after-hours press release, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence. In it, McDermott disclosed a ***$205 million cash burn*** for operating activities in the second quarter of 2019, reflecting both a $146 million net loss and the cash used on Cameron. McDermott also lowered 2019 guidance due, *inter alia,* to changed assumptions about the performance of the Four Focus Projects and a shift from 2019 to 2020 in the timing of remaining incentives on the Cameron project. On this news, which again surprised analysts, McDermott's stock price fell $3.56, on very high volume, from its July 29, 2019 closing price of $10.08 to close at $6.52 on July 30, 2019.

34.    On September 18, 2019, McDermott's stock plummeted ***49%*** in morning trading, on high volume, amid leaks and rumors that it had hired a turnaround firm. The *Wall Street Journal* published an article reporting that McDermott "has engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses."

Trading was halted for several hours, followed by multiple attempts to restart trading that had to be aborted due to volatility. Finally, McDermott issued a cryptic statement that failed to deny an impending bankruptcy filing, effectively confirming its severe financial distress. The single-day decline of $3.72, from $5.88 to $2.16, represented a ***63.3%*** decline. According to a Citi analyst report from after-hours on September 18, 2019, McDermott needed cash to counteract its negative working capital issues, and the sale of its Lummus Technology Business was among the assets that could get it that cash, even if that meant the price "in an urgent sale situation could be under pressure." Citi analysts went on to say that prior to the Merger, CB&I had received "significant interest for its Technology asset." Declines continued, both in after-market trading that day and pre-market trading the next day.

35.    On September 19, 2019, McDermott's stock fell another ***22.7%,*** on even higher volume, to close at $1.67. The two-day decline of $4.21 represented ***a reduction of 71.6% of McDermott's stock price.***

36.    Defendants had significant financial motives to close the acquisition of CB&I, notwithstanding the undisclosed problems with the Four Focus Projects, McDermott's inability to absorb those projects along with CB&I's desirable Technology Business, and the severe and unmanageable strain on McDermott's capital structure and balance sheet posed by these projects, and to mislead investors both before and after the Merger's close.  In particular, Defendant Dickson sought to use the CB&I Merger to fend off the acquisition of McDermott by third parties, such as Subsea 7, even though such an acquisition would have been a far better outcome for McDermott. Shortly after the closing of the acquisition of CB&I, Dickson admitted that the acquisition of McDermott by Subsea 7 would have been a "straightforward acquisition," which would have resulted in Dickson's termination.

37.    Incentive compensation supports a strong scienter inference for Defendants that is at least as cogent and compelling as any alternative inference. Both Defendants Dickson and Spence were motivated by incentive compensation to close the Merger promptly and to commit the securities fraud alleged herein. Attributable to their work on the Merger, Defendants Dickson and Spence received "Recognition Bonuses" of *$1,125,000* and *$637,500,* respectively. Despite the financial difficulties of fiscal year 2018, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger and post-Merger time periods to immunize Defendants Dickson and Spence from the impact of charges taken post-Merger on the Focus Projects, with Dickson's total compensation for 2018 being $11.3 million, and Spence's total compensation for 2018 being $3.5 million.  Further, the Merger gave the appearance of elevating McDermott into a different peer group of companies, leading to Defendants Dickson and Spence receiving increases in their base and incentive compensation.

38.    Defendants Dickson and Spence netted a combined *$9,984,700,* along with 727,464 additional shares acquired at no expense in net ill-gotten gains from transactions while the true facts remained hidden from investors, and McDermott's stock price was inflated by the fraud. These transactions were highly suspicious in amount, a fact that further supports the scienter inference. Dickson's *$8,015,187* in net insider transaction gains compare suspiciously against his 2018 salary of $1,125,000. Spence's *$1,969,513* in net insider transaction gains compare suspiciously against his 2018 salary of $650,000.

39.    As a result of Defendants' wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of McDermott's securities, Plaintiffs have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

40.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

41.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

42.    Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) as McDermott's U.S. headquarters are located within this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

43.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

44.    Kingstown Capital Management, LP, as investment manager, managed the purchases of CB&I shares, McDermott shares and McDermott notes at artificially inflated prices and was damaged upon revelation of Defendants' fraud, as alleged herein.

45.    Kingstown Partners Master Ltd. purchased shares of CB&I common stock during the period from April 6, 2018 through May 10, 2018 (the "pre-Merger Period") and purchased McDermott shares and notes following the Merger through June 26, 2019.

46.    Kingstown Partners II L.P. purchased shares of CB&I common stock during the pre-Merger Period and purchased McDermott shares and notes following the Merger through June 26, 2019.

47.    Ktown LP purchased shares of CB&I common stock during the pre-Merger Period and purchased McDermott shares and notes following the Merger through June 26, 2019.

48.    Kingfishers, LP purchased shares of CB&I common stock during the pre-Merger Period and purchased McDermott shares and notes following the Merger through June 26, 2019.

49.    Kingstown 1740 Fund LP held notes purchased following the Merger through June 26, 2019.

50.    Kingstown Capital Partners, LLC acted on behalf of the foregoing Kingstown purchasing entities, and as a result of the artificially inflated prices of CB&I shares, McDermott shares and notes, and the revelation of Defendants' fraud, has been damaged thereby.

51.    During the pre-Merger Period, Plaintiffs purchased shares of CB&I common stock at artificially high prices due to the dissemination of false and misleading information about the Merger and the prospects of the combined companies once McDermott acquired CB&I.  Upon the Merger, Plaintiffs' shares of CB&I were converted into shares of McDermott.

52.    Following the Merger, Plaintiffs purchased common stock and notes of McDermott at artificially high prices due to the dissemination of false and misleading information about the Merger and the post-Merger prospects of the combined companies.

53.    Plaintiffs have since sold their shares of McDermott common stock, sustaining substantial losses.  Together with losses incurred by Plaintiffs from purchases of notes issued by McDermott and other losses incurred by Plaintiffs as a result of Defendants' fraudulent conduct, Plaintiffs have suffered losses in excess of $100 million directly attributable to Defendants' misconduct.

54.    Non-Party McDermott is incorporated under the laws of the country of Panama, with its principal executive offices located at 757 North Eldridge Parkway, Houston, Texas 77079.

During the relevant period, McDermott's common stock traded on the New York Stock Exchange under the ticker symbol "MDR." At relevant times, the McDermott website has listed at least eight different analysts who followed it, and millions of McDermott common shares typically traded daily during the relevant period. Plaintiffs reserve all rights to name McDermott as an additional defendant herein.

55.    Defendant David Dickson ("Dickson") has served as President and Chief Executive Officer ("CEO") of McDermott since December 2013. According to McDermott's SEC filings, at the time of the Merger, Dickson had "more than 25 years of industry experience, including 11 years with Technip S.A. and its subsidiaries." Prior to McDermott, from September 2008 to October 2013, he served as President of Technip U.S.A. Inc., overseeing Technip's entire North American operations.

56.    Defendant Stuart Spence ("Spence") served as Executive Vice President and Chief Financial Officer ("CFO") of McDermott from August 2014 until November 4, 2019, when he resigned shortly after McDermott belatedly announced an SEC inquiry into McDermott's financial reporting regarding the projected losses on the Cameron Project.  According to McDermott's SEC filings, at the time of the Merger, Spence had "more than 25 years of financial and operation management experience with companies in oilfield products and services, and engineering and construction businesses."

57.    Defendants, because of their positions with McDermott, possessed the power and authority to control the contents of McDermott's SEC filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, including to Plaintiffs. The Defendants were provided with copies of McDermott's filings and press releases alleged herein to have been false or misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. Defendants are liable for the false and misleading statements alleged herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    McDermott's Business & Operations

58.    Headquartered in Houston, Texas, McDermott describes itself as a "premier, fully-integrated provider of technology, engineering and construction solutions to the energy industry" that has designed and built "end-to-end infrastructure and technology solutions to transport and transform oil and gas into the products the world needs today." Its corporate website states, "Customers rely on McDermott to deliver certainty to the most complex projects, from concept to commissioning. We call it the One McDermott Way."

59.    McDermott's website stated, during the relevant period, that it operated in fifty-four countries, employees 32,000 people, and uses a "diversified fleet of specialty marine construction vessels and fabrication facilities around the world." It divided corporate operations into four geographic regions and six global product lines, of which the "North, Central and South America" region (a/k/a the "Americas") and the "LNG" (liquefied natural gas) and "Power" segments are pertinent to the claims at issue.

60.    Traditionally, McDermott had focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies.

61.    For its fiscal year 2017, McDermott reported revenue of almost $3 billion and net income of more than $178 million.

62.    Although a profitable company, by 2017, McDermott had grown concerned about its lack of diversification. Almost two-thirds of its 2017 revenue came from a single client, Saudi Aramco, which also accounted for almost half of its contractual backlog. Its second largest client contributed 11% of revenues that year. Given its concentration of oil and gas production clients, McDermott remained sensitive to the cyclical nature of this industry and the changes in commodity prices. It also had an established upstream offshore presence in South and Central America and the Middle East, but little presence in the stable market of the United States. At the same time, McDermott was viewed as a potential takeover target by its rivals. Upon information and belief, during 2014 to August 2016, Defendants were discussing what steps to take next, whether to sell itself or acquire another company, and a major merger was on the table. For his part, Dickson was extremely resistant to selling McDermott, stating as late as January 3, 2018 that he did not want to "put [McDermott] up for sale and give it to someone else."

**B.    CB&I's Business & Operations**

63.    CB&I was also an engineering and construction company that focused on the oil and gas industry, but unlike McDermott, CB&I focused its downstream onshore operations in the United States, Europe, and the Middle East, and had a diverse client base. CB&I was known for constructing petrochemical plants.in

64.    In the years leading up to the Merger, CB&I's performance increasingly depended on the Four Focus Projects, which represented a massive part of its backlog.

65.    CB&I first announced in December 2013 that its joint venture with Zachry Industrial, Inc. was awarded two contracts valued at $2.5 billion to construct two trains at the Freeport Liquefaction Project in Freeport, Texas. In March 2015, CB&I announced that the Freeport project had expanded to include construction of a third train in a contract valued at over $2 billion.

66.     On March 17, 2014, CB&I and Chiyoda Corp. issued a joint press release stating that the two companies had entered into a joint venture and had been awarded a contract by Cameron LNG, LLC to construct the Cameron Liquefaction Project in Hackberry, La. The Cameron project was valued at approximately $6 billion ($3 billion each to CB&I and Chiyoda).

67.     On June 19, 2014, CB&I issued a press release about the IPL project, announcing that it had been awarded a contract, valued at over $500 million, by AES Corporation subsidiary Indianapolis Power & Light Company for the engineering, procurement and construction ("EPC") of a 671-megawatt, combined-cycle gas turbine power station near Martinsville, Indiana.

68.     On November 11, 2014, CB&I issued a press release about the Calpine project, announcing that it has been awarded a contract by Calpine Mid-Merit, LLC for the initial development phase of a combined-cycle gas turbine station in Peach Bottom Township, Pennsylvania. CB&I later disclosed the contract's value at roughly $300 million.

69.     By 2017, CB&I's performance on these Four Focus Projects was declining. On May 8, 2017, prior to trading being open, CB&I issued a press release reporting Q1 2017 operating results, reporting, *inter alia,* that "solid earnings for the quarter" were "negatively impacted by underperformance on two union construction projects." On the accompanying earnings call, CB&I quantified the charges at $167 million "due primarily to union construction projects." CB&I later identified, during its Q2 2017 earnings call, the two projects as Calpine and IPL.

70.     Several analysts revised their opinions of CB&I in light of these and similar negative disclosures about the Four Focus Projects. For example, on May 18, 2017, a Bank of America Merrill Lynch analyst slashed her price target on CB&I to $20 from $31, citing more risks to the company from incremental project charges, among other things. On June 9, 2017, a Goldman Sachs analyst cut his price target on CB&I to $15 from $33, citing higher cost overrun estimates

on the Cameron Project in the second half of 2017 and 2018. On June 21, 2017, a Macquarie analyst cut his price target on CB&I from $11.50 to $10 a share, citing delays at the Freeport Project that could lead to a possible cost overrun at CB&I.

71.    Thereafter, CB&I faced financial difficulties and an uncertain future, burdened by execution of the Four Focus Projects. CB&I's Q2 2017 earnings release on August 9, 2017, announced suspension of its dividend and pursuit of a sale of its valuable, highly regarded Technology Business to eliminate debt and to reinvest in its Engineering & Construction (E&C) and Fabrication Services businesses. CB&I's E&C business reported an operating loss of $525.7 million "due to forecasted increases in costs on [the Four Focus Projects] amounting to $548.0 million, as well as an additional $50 million from the current-quarter impact of a lower margin percentage recognized on work performed during the period on the projects." CB&I reported that "[a]s of June 30, 2017, [it] would not have been in compliance with certain covenants required under CB&I's credit agreement without amending the agreements. Effective August 9, the company amended its credit agreements ... to waive its current non-compliance and to revise future covenants." On the Q2 2017 earning call, CB&I acknowledged taking $367 million in charges on Cameron (primarily) and Freeport and $181 million in charges on Calpine and IPL, which its CEO said reflected "a more conservative view of assumptions going forward," adding that "we've got enough experience in the field right now with where we are in construction, and applying that to the future and taking the loss that we talked about today is what we've decided to do."

72.    Following these disclosures, a September 11, 2017 analyst report issued by Credit Suisse contained "takeaways" from "meetings with CBI including the new President and CEO Pat Mullen, EVO & CFO Mike Taff, and VP of IR, Scott Lamb." During those meetings, CB&I management provided an "update on problem projects" (*i.e.*, the Focus Projects) and stated that

"the charges taken in Q2'17 more accurately reflect the cost to complete the projects along with lower productivity levels vs prior estimates."

73.    In announcing Q3 2017 results, CB&I reported that it had revised its loan covenants, effective August 9, 2017, to address CB&I's difficulties on the Four Focus Projects, *e.g.*, by requiring that it maintain decreasing trailing 12-month EBITDA levels while excluding from the EBITDA calculation certain unspecified "charges on certain projects which occurred" during the first half of 2017, and "an agreed amount for potential future charges for the same projects if they were to be incurred during the third and fourth quarters of 2017." On the October 20, 2017 earnings call, CB&I's CEO acknowledged that it had "moderat[ed]" its cost forecasts for the IPL and Calpine projects and had taken $38 million in extra charges on them during the quarter. He also said that IPL was "99% complete on construction and is in the commissioning phase" and Calpine was "approximately 75% complete." He added that CB&I was at "frill site staff levels" and "continue to make good progress" on the Cameron and Freeport projects and that it was "continuing our discussions with Cameron LNG regarding claims for extension of time and recovery of certain costs on that project. We are meeting with our customer regularly, and senior management at both companies have targeted a resolution before year's end."

74.    Thus, in 2017, CB&I appeared to struggle to stay afloat amidst difficulties in executing the Four Focus Projects. CB&I had approximately $2.5 billion of debt and an over $1 billion impairment to goodwill, stemming from a $3.3 billion acquisition in February 2013. Despite 2017 revenue over $6.6 billion, CB&I reported a net loss of more than $1.4 billion was exploring strategic options to prevent bankruptcy.

75.     Upon information and belief, CB&I was "basically bankrupt" by the end of 2017. From December 3, 2016 through December 18, 2017, CB&I's common shares declined in value by 43.56% - a period during which McDermott's shares appreciated by 2.71%.

76.     Desperate, CB&I was looking to sell business units, including its crown jewel, the Technology Business, to raise badly needed capital. Upon information and belief, the Technology Business held extremely valuable patents and was likely worth about $2 billion.

77.     In the context of CB&I ongoing financial distress, McDermott and CB&I discussed a potential business combination in the fall of 2017.

### C.     Defendants Cause McDermott to Issue a Series of False and Fraudulent Statements Regarding Its Acquisition of CB&I

78.     On December 18, 2017, McDermott issued a press release (the "12/18/2017 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K (the "12/18/2017 Form 8-K") signed by Defendant Spence, announcing that McDermott was acquiring CB&I through a proposed Merger that would result in McDermott shareholders owning 53% of the combined company. Pursuant to a business combination agreement to effectuate the Merger (the "Merger Agreement"), CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity. The tenor of the disclosure was that McDermott was acquiring its distressed peer, and purportedly solving both their problems by creating a "premier fully vertically integrated onshore-offshore company with a broad engineering, procurement, construction and installation service offering and market leading technologies portfolio." The announcement quoted Defendant Dickson as stating, "By applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture."

24

79.     Several materially false and misleading misstatements and omissions of material information were made in the 12/18/2017 Press Release, and in a subsequent McDermott filing with the SEC the same day pursuant to Rule 425 ("Rule 425") under the Securities Act of 1933 (the "Securities Act") deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, as follows:

80.     The 12/18/2017 Press Release touted the combined company's ability to deliver and execute on "fixed price lump-sum contracts" like the ones in place for the Cameron, Freeport, and Calpine projects, stating, "***McDermott and CB&I's combined experience in delivering*** customer centric solutions and ***fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects*** for customers."

81.     The 12/18/2017 Press Release touted the Merger as enhancing the ability to respond to customer needs while maximizing asset value in LNG and power projects:

> Greater ability to respond to evolving customer needs. ***The combined company will offer customers engineered and constructed facility solutions and fabrication services across the full lifecycle, executed to maximize asset value. Customers will also benefit from enhanced exposure across diverse end markets, including refining, petrochemicals, LNG and power***.

82.     The 12/18/2017 Press Release touted the size of the post-Merger company's backlog, without disclosing the extent to which it would be weighed down by the Cameron, Freeport, and Calpine projects, stating (with footnotes omitted), "On a pro forma combined basis, McDermott and CB&I would have combined revenues of approximately $10 billion and ***a backlog of approximately $14.5 billion.***"

83.     The 12/18/2017 Press Release also touted the Merger's extensive purported opportunities for "synergies" and revenue impacts, after purportedly "one-time" costs:

> Cash accretive with opportunities for cost and revenue synergies. The transaction is expected to be cash accretive, ***excluding <u>one-time</u> costs,*** within the first year after closing. It is also expected to generate annualized cost synergies of $250 million in

2019. ***This is in addition to the $100 million cost reduction program that CB&I expects to have fully implemented by the end of 2017 previously implemented*** [sic]. The cost synergies are expected to come from operations optimization, G&A savings, supply chain optimization and other related cost savings. Further, McDermott and CB&I expect that the transaction will lead to substantial revenue synergies due to the enhanced capabilities of the combined company.

84.    The 12/18/2017 Press Release also quoted Defendant Dickson as stating, *inter alia*:

Customers worldwide increasingly seek a single company that can offer end-to-end solutions, and the combination of McDermott and CB&I responds to these evolving customer needs ***by creating a leading vertically integrated company.***

This transaction combines ***two highly complementary businesses*** to create a leading onshore-offshore EPCI company driven by technology and innovation, with the scale and diversification to better capitalize on global growth opportunities

85.    Also on December 18, 2017, McDermott published a 30-page slide presentation (the "12/18/2017 Presentation"), which was attributed to Defendants Dickson and Spence therein and which was posted on McDermott's corporate website and filed with the SEC as an attachment to the 12/18/2017 Form 8-K signed by Defendant Spence. The 12/18/2017 Presentation made several materially false and misleading misstatements, and omitted material information from the statements made, as follows. It touted the combined company's attributes, by stating (footnotes omitted) that the Merger was purportedly "creating a premier $10 billion global, ***fully vertically integrated*** onshore-offshore EPCI provider" and ***"combining complementary and diversified capabilities***." It highlighted the combined company's backlog and purported cost-saving synergies, stating that it would have "combined revenues of approximately $9.9Bn and a ***backlog of $14.5Bn"*** - of which $12.1 billion was CB&I backlog - and was "expected ***$250 million annual cost synergies***," which it explained as "[e]xpected to generate ***annualized cost synergies of $250m in 2019 (in addition to the $100m cost reduction program that CB&I expects to have fully implemented by the end of 201***7)." It highlighted that a common ***"focus*[ ]*on*** safety, ***fixed lump-***

*sum contracting* and customer engagement will ensure seamless transition for partners and employees." Last, it reported these CB&I Non-GAAP Reconciliations:

## CB&I NON-GAAP RECONCILIATIONS

| | Three Months Ended Dec 31, 2016 | Nine Months Ended Sept 30, 2017 | Last Twelve Months Sept 30, 2017 |
|---|---|---|---|
| (Dollars in millions) | | | |
| GAAP Net Income (Loss) Attributable to CB&I[1] | $(21) | $(284) | $(305) |
| Plus: Non-GAAP Adjustments | | | |
| Receivable Reserve from Sale of Nuclear Operations[3] | 148 | - | 148 |
| Significant Project Charges[2] | 205 | 641 | 846 |
| Restructuring Costs[4] | - | 31 | 31 |
| Accelerated DIC Amortization[5] | - | 22 | 22 |
| Total Non-GAAP Adjustments | 353 | 694 | 1,047 |
| Tax Effect of Non-GAAP Changes[6] | (124) | (243) | (367) |
| Total Non-GAAP Adjustments (After Tax) | 229 | 451 | 680 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $208 | $167 | $375 |
| GAAP Net Income (Loss) Attributable to CB&I[1] | $(21) | $(284) | $(305) |
| Add: | | | |
| Depreciation & Amortization | 22 | 62 | 84 |
| Interest Expense, Net | 16 | 117 | 133 |
| Provision for Income Taxes | (137) | (158) | (295) |
| EBITDA[7] | $(120) | $(263) | $(383) |
| EBITDA | $(120) | $(263) | $(383) |
| Plus: Non-GAAP Adjustments | 353 | 672 | 1,025 |
| Non-GAAP Adjusted EBITDA[7] | $233 | $409 | $642 |

86.    Also on December 18, 2017, McDermott held an investor call (the "12/18/2017 Investor Call") regarding the proposed Merger, on which Defendants Dickson and Spence spoke, a transcript of which was filed with the SEC by McDermott via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. During it, Defendants Dickson and Spence made several materially false and misleading misstatements, and omitted material information from the statements made, as follows.

87.    In discussing the proposed Merger, Defendant Dickson stated in prepared remarks, *"Our operations and capabilities are highly complementary,"* and *"[o]ur companies share...a similar approach to conducting business...and we both primarily operate on fixed price lump-*

27

*sum contracts."* He added, ***"We also expect the combination will generate substantial cost and revenue synergies."***

88.     *Defendant* Spence stated in prepared remarks, regarding potential cost synergies:

> ***We expect to generate annualized cost synergies of $250 million in 2019. This is in addition to the $100 million cost reduction program that CB&I expects to be fully implemented by the end of 2017. We expect to incur a <u>onetime cost</u> of $210 million to realize these synergies*** of which $170 million will be in 2018 and the remaining $40 million in 2019.

89.     Defendants further stated that:

> As you know, my past obviously come from the world of both onshore and offshore, I look at the future, I consider things such as technology, a diversification and scale. And when this opportunity came up, I was able to satisfy in all 3 areas and I just think this is a fantastic opportunity for both companies to really create what is going to be a Tier-1 first class organization.

> \*\*\*\*

> This combination is good news for McDermott. As David said in his note to you earlier today, CB&I's strong technology offering and capabilities in the onshore and LNG markets will give us the scale and diversification to compete in new areas. This is particularly true in our part of the world. McDermott will be able to leverage CB&I's existing relationships in these regions and aim to deliver customers FEED, installation, MMO services and end-to-end engineered and constructed facility solutions across the full project lifecycle. This combination is about growth and it sets the stage for future success, while creating exciting new opportunities for McDermott.

90.     During Q&A, *Defendant* Dickson had this exchange with an analyst concerning the

Cameron LNG product and the Freeport LNG Project:

> ***[Analyst]:***     David, when you came on to McDermott, obviously, it had its share of issues with fixed price projects, and again I think you've done a good job of cleaning them up. But CBI, as you mentioned, you guys have done a lot of due diligence on these projects, and people have covered these companies for a long time, we do hear that. And then ultimately, some companies still have issues.

> So, these are sort of big - a couple of these are really big projects, so how much experience have you had with the customers themselves? ***How much due diligence have you done in terms of really getting your arms around the couple — the bigger LNG projects so that you can sort of give us some comfortability factor that you've really sort of priced in the potential risk on these projects***?

*[Defendant Dickson]:* [W]e obviously, as said earlier, we have spent a significant amount of time and resources on this. As you know, with my past background, it gives me some better insight on how these projects evolve. And these projects are all at different stages of completion, and ***all four of them are fairly well progressed, so that takes out a lot of the risk that you would expect at the startup.*** So we're very happy with the work that we've done in the work to go.

In terms of dialogue with the customer of those projects, obviously, I haven't been able to start any dialogue as we're being through a very confidential process. But what I can say is ***historically I've had experience with both working with the customer on the Cameron LNG and with the customer on the Freeport LNG.*** So now that we have announced, that allows me to join with Pat and obviously get a bit closer with the customer on these things. But going back to what I said earlier on the call and the prepared remarks in which Stuart said is, ***an extensive amount of work has been done on these projects and obviously with a lot of focus with the work that's left or the balance of the work that's left on what has been four critical projects for CB&I.***

91.    The foregoing misstatements on or about December 18, 2017 were materially false and misleading, ***inter alia,*** for the reasons stated in ¶¶ 148-169; 206-267 below.

92.    Analysts reacted immediately to news of the Merger, expressing surprise and some caution about the risks being undertaken by McDermott. In a December 19, 2017 analyst report titled "Heading Onshore: MDR Acquires CBI," Deutsche Bank noted that "The key swing factor will be execution post the close, which remains uncertain" because, among other things, "MDR [is] taking on 3 large scale projects with execution issues." The analyst report minimized this "swing factor," however, noting that McDermott "[b]egan the due diligence process in the summer (>3mos)," and "Mgmt feels very comfortable with 3 remaining problem projects (LPL nearly complete, Calpine, Cameron LNG, and Freeport LNG remain), ran a sensitivity analysis on productivity factors to get more comfortable." Similarly, analysts from MKM Partners noted on December 19, 2017 that while "[t]he news comes as a surprise to investors," "MDR management said on the call that they had done exhaustive due diligence on CBI's backlog and are comfortable with the risks there regarding further charges." These concerns were further allayed the next day when CB&I announced a settlement concerning certain outstanding liabilities relating to the

Cameron Project. Deutsche Bank, also on December 19, 2017, added that "From a MDR perspective, deal price appears attractive, especially after factoring in the $250M in cost synergies...." Their report also stated that McDermott's management has a good track record of "turning around challenged EPC companies with high mix of fixed price work and large projects" and the deal was expected to be cash EPS accretive for McDermott. The report, speaking about CB&I's "problem projects" said that McDermott management "believes it can apply its overall project execution culture to move forward."

93.    On January 8, 2018, McDermott filed a Form 8-K with the SEC (the "1/8/2018 Form 8-K"), signed by Defendant Spence, attaching as exhibits a press release (the "1/8/2018 Press Release" and an updated 48-page slide presentation (the "1/8/2018 Presentation") regarding the proposed CB&I acquisition that once again was attributed to Defendants Dickson and Spence, who were highlighted in "Management Profiles" in the presentation. While the 1/8/2018 Presentation overlapped with the 12/18/2017 Presentation and repeated some of the misstatements first made therein, it differed in several ways, including that it expressly discussed the so-called "Four Focus Projects" being acquired with CB&I (the Cameron LNG Project, Freeport LNG Project, and Calpine Gas Turbine Power Project, along with another project, the IPL Project), it included accounting adjustments specific to the "Four Focus Projects," and it emphasized the "thorough due diligence" that McDermott had undertaken into CB&I's overall business and specifically into the "Four Focus Projects," which was described as giving Defendants "a strong understanding of the key drivers and [such that we] are comfortable with what needs to be done with these projects going forward." The 1/8/2018 Presentation made several materially false and misleading misstatements, and omitted material information from the statements made, as follows.

30

94.     The 1/8/2018 Presentation, like the 12/18/2017 Presentation before it, touted the purported attributes of the combined, post-Merger company, by stating (footnotes omitted) that the Merger purportedly "[c]reates a premier $10 billion global, *fully vertically integrated* onshore-offshore EPCI provider" and "'*combines complementary and diversified capabilities*." It highlighted the combined company's backlog and the purported cost-saving synergies to be achieved, stating that the post-Merger company would have "combined revenues of approximately $9.9Bn and a *backlog of $14.5Bn*" - of which $12.1 billion was CB&I backlog - and would be "[expected to generate *annualized cost synergies of $250m in 2019 (in addition to the $100m cost reduction program that CB&I has <u>already implemented</u>)."* Significantly, this revised language told investors that the CB&I "cost reduction program" referenced earlier in the 12/18/2017 Presentation had by this point been *"already implemented*."

95.     The 1/8/2018 Presentation stated that, since the 12/18/2017 Presentation, McDermott had made the accounting and financial reporting adjustments necessary to address the "Four Focus Projects" and that, significantly, these adjustments were "non-recurring." Specifically, it stated, "This deck includes certain non-GAAP financial metrics and *adjustments that we believe to be <u>non-recurring</u>,* as we believe this provides a better understanding of the underlying business. These adjustments are consistent with those used in McDermott's adjusted financial metrics. *The adjustments included primarily relate to* the Four Focus Projects: IPL, *Calpine, Freeport, and Cameron*." It then reported adjusted CB&I Non-GAAP Reconciliations, both for CB&I as a whole and as separately reported by its four business segments (Engineering & Construction (E&C), Fabrication Services (FS), Technology (Tech), and Capital Services (CS)):

31

## CB&I NON-GAAP RECONCILIATION FOR LTM 9/30/17[11]

| | Three Months Ended Dec 31, 2016 | Nine Months Ended Sept 30, 2017 | Last Twelve Months Sept 30, 2017 |
|---|---|---|---|
| (Dollars in millions) | | | |
| GAAP Net Income (Loss) Attributable to CB&I, as reported[1] | $(666) | $(391) | $(1,056) |
| Less: Net Income (Loss) Attributable to Capital Services[2] | 645 | 107 | 752 |
| GAAP Net Income (Loss) Attributable to CB&I, on a continuing operations basis | (21) | (284) | (305) |
| | | | |
| Plus: Non-GAAP Adjustments | | | |
| Loss on Sale of Nuclear Operations[3] | 148 | - | 148 |
| Significant Project Charges | 128 | 769 | 897 |
| Restructuring Costs[5] | - | 31 | 31 |
| Accelerated DIC Amortization[6] | - | 22 | 22 |
| Total Non-GAAP Adjustments | 276 | 822 | 1,098 |
| Tax Effect of Non-GAAP Changes[7] | (97) | (288) | (384) |
| Total Non-GAAP Adjustments (After Tax) | 179 | 534 | 714 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $159 | $251 | $409 |
| | | | |
| GAAP Diluted EPS, as reported[1] | (6.65) | (3.87) | (10.52) |
| Non-GAAP Adjustments | 8.22 | 6.34 | 14.56 |
| Non-GAAP Diluted EPS | $1.57 | $2.47 | $4.04 |
| | | | |
| Shares | | | |
| Basic | 100 | 101 | 101 |
| Diluted | 101 | 102 | 101 |
| | | | |
| GAAP Net Income (Loss) Attributable to CB&I | $(21) | $(284) | $(304) |
| Add: | | | |
| Depreciation & Amortization, as reported | 29 | 66 | 95 |
| Interest Expense, Net, as reported | 22 | 6 | 28 |
| Provision for Income Taxes, as reported | (130) | (177) | (307) |
| Reclassification of Discontinued Operations and Adjustments[8] | (20) | 125 | 105 |
| EBITDA[10] | $(119) | $(263) | $(383) |
| | | | |
| EBITDA | $(119) | $(263) | $(383) |
| Plus: Non-GAAP Adjustments | 276 | 800 | 1,076 |
| Non-GAAP Adjusted EBITDA[10] | $157 | $537 | $694 |

96.    The 1/8/2018 Presentation also included specific "Observations" regarding each of the Four Focus Projects, including certain "*Unique Characteristics that will continue to be de-risked significantly in 2018.*"

97.    For the Calpine Gas Turbine Power Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being "Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party product." However, these were tempered by the "Assessment" that "*Additional two turbines recently turned over for commissioning*" and a "Status as of 9/30/2017" as being "*76% complete.*"

98.    For the Freeport LNG Project, with "Original Booking Value" of $2 billion, it listed just one "Unique Characteristic," that being "Higher level of indirect labor (limiting control)." Significantly, it **did _not_ list** "Aggressive bidding by predecessor" - as was done for Calpine. The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs still being assessed as technical solutions are being determined," but that "***Train 1 steel erection milestone achieved"*** and ***"Zachety (JV Partner) is managing and performing project construction phase and has a demonstrated track record."*** The "Status as of 9/30/2017" was "***Engineering complete, Procurement substantially complete, Construction remaining, project remains profitable."***

99.    For the Cameron LNG Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "Significant quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays." Significantly, as with Freeport, it **did _not_ list** "Aggressive bidding by predecessor" - as was done for Calpine. The "Assessment" stated that "Majority of remaining risk related to labor and schedule," but that "***Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the trigger for any potential liquidated damage claims, increasing certainty of project schedule resulting in a de-risking of the project."*** The "Status as of 9/30/2017" was "***Engineering complete, Procurement substantially complete, Construction remaining; targeting 2019 for all 3 trains."***

100.    In this context, the 1/8/2018 Presentation also summarized the purported findings of McDermott's due diligence over a "period of months" into CB&I's overall business and the "Four Focus Projects" in particular. Using then-present or then-past tense language, it falsely articulated as a "Key Assessment" that the "***Four focus projects have been significantly de-risked with***

33

*respect to engineering, quantities and procurement." It stated that "remaining risk is assessed as mostly related to labor performance." It added, however, "We believe the four focus projects are not representative of the entire portfolio and have unique characteristics that will continue to be de-risked significantly in 2018."*

101.    On January 9, 2018, Defendant Dickson gave an interview with *Bloomberg Markets,* a transcript of which was filed by McDermott with the SEC via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. The ***Bloomberg*** piece referenced the proposed Merger and the "four projects dragging down profit" for CB&I, as well as McDermott's track record under Dickson in turning eight out of nine of McDermott's unprofitable projects into profitable ones. It said that Dickson vowed to do at CB&I what he did at McDermott and quoted him as describing CB&I as follows: ***"It has all the hallmarks of the McDermott of three or four years ago. Everything is fixable."***

102.    The foregoing misstatements made during January 2018, were materially false and misleading, ***inter alia,*** for the reasons stated in ¶¶ 148-169; 206-267 below.

103.    On February 21, 2018, McDermott held a conference call with analysts (the "2/21/2018 Earnings Call") regarding its Q4 2017 earnings release, on which Defendants Dickson and Spence discussed the Merger and the Four Focus Projects. McDermott filed a copy of the 2/21/2018 Earnings Call transcript with the SEC on February 22, 2018, via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. During the 2/21/2018 Earnings Call, Defendants made several materially false and misleading misstatements, and omitted material information from the statements made, as follows.

104.    In prepared remarks, Defendant Dickson expressed "even more confidence" in the Merger after telling analysts, *inter alia,* that IPL was essentially complete, such that the Four Focus

Projects were "now down to three," and that Freeport was "stabilized and profitable," all leading to the impression that 50% of those projects were of no concern, as follows:

> *[A]s IPL Eagle Valley is in its very final stages of delivery, we are pleased that the focused four projects are now down to three.* In addition, *Freeport is currently stabilized and profitable. We remain confident that our combination with CB&I will generate significant benefits for our shareholders by* better positioning us to meet evolving customer needs, diversifying our portfolio of capabilities, as well as our geographic footprint *providing a strong capital structure* and by delivering significant synergies. In fact, *the integration planning now well under way, we're even more confident in our synergy expectations and looking forward to a timely closing.*

105.    In the context of CB&I's having disclosed over $100 million of Q4 2017 operating charges related to the Four Focus Projects, Defendant Dickson reassured investors that the situation was expected and under control, specifically referencing McDermott's "robust" due diligence into CB&I and the Four Focus Projects in the following remark, which was repeated by analysts following McDermott in their ensuing reports:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional charges attributable to the Four Focused Projects. *The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.*

106.    During Q&A, Defendants were again asked about the charges CB&I took regarding the Four Focus Projects, and again they referenced their due diligence as a basis for their informed remarks the charges were expected and not a cause for alarm, for instance in this exchange involving Defendant Dickson:

> [Analyst]: I understand the comments you made about CBI's print and that they were contemplated within your downside risk scenario. But just to be clear, I mean does this imply that we're already starting off below where we wanted to or in line? And could you put that in sort of context with how we should think about CBI's guidance that they provided in their S-4 at least for 2018?

> [Defendant Dickson]: So, *on the disclosure given by CB&I yesterday,* as I said in my prepared remarks, *all of it is within our evaluation that we did during this due diligence period.* Obviously, today, we're operating in separate companies, but

35

credit to the CB&I management team they kept us posted as developments have occurred. So we're obviously monitoring the situation, but *what I could say today is that it's in line with what we've been looking at and well within the work that we did during the due diligence.*

107.   Defendant Spence made similar remarks during Q&A, as follows:

[Analyst]: And turning to CB&I, how was your expected pro forma funding post the deal changed over the last few months? Obviously, they had the [] December …. settlement, which should drive some additional expected cash flows. Not sure if that was already fully in your expectation for the $3.3 billion of pro forma funding, but maybe if you could just talk a little bit about how that's developing.

[Defendant Spence]: As David highlighted before, *the Q4 results for CB&I were all within the parameters of our diligence and our understanding and the models that we built.* And *as such, we're still looking at the same funding levels that we highlighted in December to fund the combination, which is the approximate $3.3 billion of funded debt.* On March 22, 2018, McDermott filed a Form 8-K with the SEC [the "3/22/2018 Form 8-K"], signed by Defendant Spence, attaching as an exhibit an updated, 51-page version ([the "3/22/2018 Presentation"] of the earlier-filed 1/8/2018 Presentation regarding the proposed CB&I acquisition that once again was attributed to Defendants Dickson and Spence, who were highlighted in "Management Profiles" in the presentation. It again specifically discussed the Four Focus Projects, included accounting adjustments specific to the Four Focus Projects, and emphasized the "thorough due diligence" that McDermott had undertaken into CB&I's overall business and specifically into the Four Focus Projects, which was described as giving Defendants "a strong understanding of the key drivers and [such that we] are comfortable with what needs to be done with these projects going forward."

108.   The 3/22/2018 Presentation made several materially false and misleading misstatements, and omitted material information from the statements made, as follows:

109.   The 3/22/2018 Presentation, like the 1/8/2018 Presentation and 12/18/2017 Presentation before it, touted the purported attributes of the combined, post-Merger company, by stating (footnotes omitted) that the Merger purportedly "[creates a premier $10 billion global, *fully vertically integrated* onshore-offshore EPCI provider" and "*combines complementary and diversified capabilities*." It highlighted the combined company's backlog and the purported cost-saving synergies to be achieved, stating that the post-Merger company would have "combined revenues of approximately $9.7Bn and a *backlog of $15.3Bn*"—of which $11.4 billion was CB&I

backlog—and would be "[e]xpected to generate **annualized cost synergies of $250m in 2019 (in addition to the $100m cost reduction program that CB&I has _already implemented)_.**" Significantly, this revised language told investors that the CB&I "cost reduction program" referenced earlier in the 12/18/2017 Presentation had by this point been "*already implemented.*"

110.  The 3/22/2018 Presentation stated that McDermott had made the accounting and financial reporting adjustments necessary to address the "Four Focus Projects" and that, significantly, these adjustments were "non-recurring." Specifically, it stated, "This deck includes certain non-GAAP financial metrics and **adjustments that we believe to be _non-recurring_**, as we believe this provides a better understanding of the underlying business. These adjustments are consistent with those used in McDermott's adjusted financial metrics. **The adjustments included primarily relate to the Four Focus Projects: IPL, Calpine, Freeport, and Cameron.**" It then reported adjusted CB&I Non-GAAP Reconciliations, both for CB&I as a whole and as separately reported by its four business segments (Engineering & Construction (E&C), Fabrication Service s (FS), Technology (Tech), and Capital Services (CS)):

# CB&I NON-GAAP EBITDA RECONCILIATIONS FOR HISTORICAL RESULTS 2013 – 2017[1]

| | For the year ended | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| (Dollars in millions) | | | | | |
| GAAP Net Income (Loss) Attributable to CB&I, as reported[2] | $454 | $544 | ($504) | ($313) | ($1,458) |
| Add: Losses (Income) From Discontinued Operations | | | | | |
| Capital Services[3] | (9) | (37) | (43) | 621 | 105 |
| Nuclear Operations[4] | (37) | (93) | (131) | - | - |
| GAAP Net Income (Loss) from Continuing Operations Attributable to CB&I | $408 | $414 | $(679) | $308 | $(1,353) |
| | | | | | |
| Add: Non-GAAP Adjustments | | | | | |
| Charges Related to Nuclear Operations Sale[6] | - | - | 1,506 | 148 | - |
| Long-Term Incentive Change in Control Expense[6] | - | - | - | - | 12 |
| Significant Project Charges[7] | - | - | - | 197 | 870 |
| Restructuring, Acquisition and Integration Costs[8] | 81 | 31 | - | - | 115 |
| Net Gain from Insurance Proceeds[9] | - | - | - | - | (63) |
| Tax Law and Deferred Tax Valuation Impacts[10] | - | - | - | - | 1,002 |
| Normalized Interest Expense[11] | - | - | - | - | 97 |
| Total Non-GAAP Adjustments | 81 | 31 | 1,506 | 345 | 2,033 |
| Tax Effect of Non-GAAP Changes[12] | (28) | (11) | (371) | (121) | (353) |
| Total Non-GAAP Adjustments (After Tax) | 53 | 20 | 1,135 | 224 | 1,680 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $460 | $434 | $456 | $532 | $327 |
| | | | | | |
| GAAP Net Income (Loss) from Continuing Operations Attributable to CB&I | $408 | $414 | $(679) | $308 | $(1,353) |
| Add: | | | | | |
| Depreciation & Amortization, as reported | 180 | 181 | 161 | 123 | 88 |
| Interest Expense, Net, as reported | 81 | 75 | 86 | 92 | 226 |
| Provision for Income Taxes, as reported | 91 | 271 | (81) | 3 | 799 |
| Reclassification of Discontinued Operations and Adjustments[14] | (115) | (177) | (186) | (73) | - |
| EBITDA[13] | $644 | $765 | $(699) | $453 | $(240) |
| | | | | | |
| EBITDA | 644 | 765 | (699) | 452 | (240) |
| Plus: Adjustments | 81 | 31 | 1,506 | 345 | 934 |
| Non-GAAP Adjusted EBITDA[15] | $725 | $797 | $807 | $798 | $694 |

111.   The 3/22/2018 Presentation also included specific "Observations" regarding each of the Four Focus Projects, including certain "***Unique Characteristics that will continue to be de-risked significantly in 2018.***"

112.   For the Calpine Gas Turbine Power Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being "Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party

38

product." However, these were tempered by the "Assessment" that "***Additional two turbines recently turned over for commissioning***" and a "Status...as of year-end 2017" as being "~79% complete."

113.    For the Freeport LNG Project, with "Original Booking Value" of $2 billion, it listed three "Unique Characteristics," that being "Higher level of indirect labor (limiting control), impacted by Hurricane Harvey, and significant quantity growth." Significantly, it ***did not list*** "Aggressive bidding by predecessor"—as was done for Calpine. The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs still being assessed as technical solutions are being determined," but that "***Train 1 steel erection milestone achieved***" and "***Zachery (JV Partner) is managing and performing project construction phase and has a demonstrated track record.***" The "Status... as of year-end 2017" was "~73% complete" and "Project remains profitable."

114.    For the Cameron LNG Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "Significant quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays." Significantly, as with Freeport, it ***did not list*** "Aggressive bidding by predecessor"—as was done for Calpine. The "Assessment" stated that "Majority of remaining risk related to labor and schedule," but that "***Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the schedule for any potential liquidated damages, increasing certainty of project schedule resulting in a de-risking of the project***." The "Status...as of year-end 2017" was "~77% complete."

115.    In this context, the 3/22/2018 Presentation also summarized the purported findings of McDermott's due diligence over a "period of months" into CB&I's overall business and the

"Four Focus Projects" in particular. Using then-present or then-past tense language, it falsely articulated as a "Key Assessment" that the "*Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement.*" It stated that "remaining risk is assessed as mostly related to labor *performance.*" It added, however, "*We believe the four focus projects are not representative of the entire portfolio and have unique characteristics that will continue to be de-risked significantly in 201*8."

116.    The foregoing misstatements included in the 3/22/2018 Presentation were materially false and misleading, ***inter alia,*** for the reasons stated in ¶¶ 148-169; 206-267 below.

117.    On January 24, 2018, McDermott and a wholly-owned subsidiary of CB&I filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed three amendments on Forms S-4/A on March 2, March 23 and March 27, 2018. The March 27, 2018 Form S-4/A contained the definitive Proxy Statement (the "Proxy Statement"), including the attached Merger Agreement. On March 29, 2018, McDermott filed a Form 8-K pursuant to Rule 425 under the Securities Act announcing that the March 27, 2018 registration statement had been declared effective as of 2:00 pm Eastern Daylight Time on March 29, 2018, and, further, that McDermott and CB&I had established a record date of April 4, 2018 and a meeting date of May 2, 2018 for the special meetings of their respective shareholders to seek approvals related to the proposed combination. On March 29, McDermott and CB&I filed a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3) and McDermott mailed it to McDermott's shareholders. On April 2, 2018, McDermott filed additional materials related to the Merger on Form DEFM14A.

118.    The Proxy Statement explained the terms and conditions of the Merger to shareholders, informed them about the background of the Merger, and set forth the reasons why the McDermott and CB&I boards of directors recommended that shareholders vote in favor of the

Merger. The Proxy Statement specifically incorporated by reference documents into the Proxy Statement that "contain important information about McDermott and CB&I and their respective financial performance." These documents, discussed below, included Forms 10-Q filed by CB&I and McDermott as well as Forms 8-K filed by McDermott and CB&I on January 8, 2018 and March 22, 2018, all filed pursuant to Rule 425.

119.    On March 27, 2018, McDermott filed with the SEC Amendment No. 3 to a Form S-4 Registration Statement. The Explanatory Note to the amendment (page *i)* stated that it contained, among other things, a joint proxy statement that would be used in connection with the special meeting of McDermott shareholders being held on May 2, 2018, and the special meeting of CB&I shareholders being held on May 2, 2018.

120.    The Amendment No. 3 and Proxy/Statement Prospectus (*i.e.* the Proxy Statement) were declared effective by the SEC on March 29, 2018, and was mailed to McDermott shareholders of record as of April 4, 2018. The Merger was subject to a vote of both McDermott and CB&I shareholders, voting separately, pursuant to the Proxy Statement. The record date for the vote was April 4, 2018. On March 29, 2018, CB&I filed that same Proxy Statement with the SEC as an exhibit to a Schedule 14A.

121.    The Proxy Statement described ten days of meetings that took place between September 2017 and December 2017 during which representatives from McDermott met with representatives from CB&I and engaged in "due diligence." The description of these meetings was used to falsely reinforce Defendants' earlier representations that the Company "performed thorough due diligence" such that it was "comfortable with what needs to be done with these projects going forward." For example, Defendants state in the Proxy Statement that "Mr. Freeman, other representatives of McDermott, Ms. David and respective advisors of McDermott and CB&I

met in person or spoke by telephone on multiple occasions to conduct due diligence." McDermott noted that its Board had "considered the challenges and potential costs of combining and integrating the businesses" when considering the Merger.

122.   Because McDermott's Board did not unanimously vote in approval of the Merger, McDermott was forced to provide to the Company and its shareholders additional information about its claimed due diligence and risks represented by the Focus Projects.

123.   The Proxy Statement described that one member of McDermott's Board of Directors (the "Board"), Stephen Hanks, voted against the Merger. According to McDermott's last Form 10-K before the Merger with CB&I, filed on March 8, 2018, Mr. Hanks "held various roles with Washington Group International, Inc. (and its predecessor, Morrison Knudsen Corporation) ("Washington Group"), an integrated engineering, construction, and management solutions company for businesses and governments worldwide." The 2018 10-K continues, "The Board of Directors believes Mr. Hanks is qualified to serve as a director in consideration of his extensive experience in the international engineering and construction business and his broad knowledge in accounting, auditing and financial reporting, and his legal background."

124.   McDermott reported that "Stephen G. Hanks, the dissenting director, did not vote in favor of the transaction due in large part to his ***stated belief that the business operated by CB&I is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods***." The Proxy Statement continued, noting that:

> At each of the meetings of the McDermott Board at which the potential business combination was discussed, Mr. Hanks consistently stated that he believes, based on his prior experience in the engineering and construction (E&C) industry, that the E&C business operated by CB&I (and historically operated by certain of its predecessors) is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have

negatively impacted CB&I's results of operations in recent periods, that ***these problems may be difficult for McDermott's management to remedy (at least in the near term) and, therefore, that the Combination is too risky for McDermott,*** taking into account the combined balance sheet of the two companies.

125.    Notably, Mr. Hanks based his concerns "on his experience as President and Chief Executive Officer of Washington Group [], during which time that company acquired a business with two significant, fixed-price, lump-sum, combined-cycle gas power plant projects in the northeastern region of the United States that Mr. Hanks described as having generated over $2.0 billion in losses that led to Washington Group's filing for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code." Dissenting Director Hanks was particularly well-positioned to offer an opinion on risks of the Merger.

126.    The Proxy Statement described McDermott management's response to Dissenting Director Hanks and the views of the other members of McDermott's Board, which ultimately prevailed in approving the Merger:

> Mr. Hanks also asked detailed questions of McDermott's management team, and McDermott's management, in turn, provided detailed responses and, ultimately, expressed the belief that, ***based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management.***

127.    The Proxy Statement contained an unaudited pro forma balance sheet. Column 3 of this balance sheet has "Preliminary Purchase Price Allocation." On page 173 of the Proxy Statement are the pro forma adjustments which reveal that other than intangible assets, no fair value adjustments had been provided. The following language appears under the table on that page:

> Other than the items listed above, ***we have assumed that the fair value of all assets and liabilities equal their respective carrying values.*** Until the Combination is complete, we will not have full access to all relevant information and will not have completed our evaluation. As a result, fair value estimates are preliminary and subject to change.

The final allocation of Combination consideration will be determined when we have completed the detailed valuations and necessary calculations. The final allocation could differ materially from the preliminary allocation used in the pro forma adjustments. The final allocation may include: (1) change for the fair value of CB&I's contracts in process, net of advance billings on contracts . . . .

128. On the day following McDermott's announcement of the Merger Agreement, CB&I had issued a press release announcing that it had reached a settlement with Cameron LNG, the client on the Cameron project (the "Cameron Settlement Agreement"), which CB&I's CEO called "an important milestone in resolving all past commercial issues and aligning all parties toward the successful completion of the project." He added, "We appreciate the collaboration of Cameron LNG and look forward to their continued support as we move forward with the safe and on-time completion of this significant energy infrastructure project." Significantly, the Cameron Settlement Agreement seemed to clear up any prior claims and potential future impacts from past difficulties on the Cameron project, as stated in the press release:

The settlement resolves all known and unknown claims to date (including impacts from Hurricane Harvey) and includes the following key components:

- Resolves all past commercial issues and increases the certainty of the project schedule, which has all three liquefaction trains producing LNG in 2019

- Provides incentive bonus payments related to expedited project completion

- Waiver of any schedule-related liquidated damages related to the original contract and reestablishment of liquidated damage start dates according to the settlement.

129. During the post-announcement/pre-Merger time period, on February 20, 2018, CB&I announced its Q4 2017 operating results, which disclosed $101 million in operating charges on the Four Focus Projects, as follows:

- Cameron LNG project: $39.0 million, resulting in part from the recognition of incremental costs resulting from Hurricane Harvey, which the company agreed to absorb in connection with the December 2017 settlement agreement with the project sponsor. The settlement considerably de-risked the project for CB&I, as it resolved all past commercial issues, provides significant cost coverage for

certain past and current cost increases, included an incentive bonus payment related to expedited project completion and, importantly, reset the trigger dates for any potential liquidated damages. As of December 31, 2017, the project was approximately 77 percent complete and was forecasted to be completed in the fourth quarter of 2019.

- Freeport LNG project: $20.0 million, due in part to the adjustment of contingency provisions in the existing contract. The company was continuing to evaluate and estimate the indirect impacts of Hurricane Harvey, including potential impacts to productivity and schedule-related prolongation costs. The company believed any costs incurred as a result of the hurricane were recoverable under contractual force majeure provisions. The pace of incremental progress on the project increased substantially during the fourth quarter as compared to prior quarters. As of December 31, 2017, the project was approximately 73 percent complete and was forecasted to be completed in the third quarter of 2019.

- Calpine combined-cycle gas turbine power project: $35.0 million, primarily resulting from disruption of construction activities caused by severe winter weather during the fourth quarter. The charge included the benefit of a claims settlement (subject to final documentation) with the project owner, which resulted in a net increase in project price during the fourth quarter for schedule incentives (based on a revised schedule) and the resolution of schedule liquidated damages. As of December 31, 2017, the project was approximately 79 percent complete and was forecasted to be completed in the fourth quarter of 2018.

- IPL/Eagle Valley combined cycle gas turbine power project: $7.0 million associated with the close-out of the project, which was expected to be essentially completed by the end of this month.

130. CB&I's Form 10-K filed with the SEC on February 21, 2018, also reassured investors that forecasts on the Four Focus Projects were realistic. For example, when discussing the gas projects, CB&I recognized the recent setbacks but stated that current forecasts "anticipate[ ] productivity levels that are consistent with our overall historical experience on the project and improved progress (due in part to anticipated improvement in weather conditions as the project moves out of the winter months), and actions to reduce our schedule related indirect costs." It added that the Cameron forecast "anticipates improvement in productivity from our overall historical experience on the project (as we anticipate improved construction performance for each

subsequent LNG train) and actions to significantly reduce our schedule related indirect costs." CB&I also included similar reassurances in its Form 10-Q filed on April 24, 2018, just before the Merger closed.

131.    These CB&I disclosures were made during early 2018, after McDermott completed its pre-announcement due diligence and while it was undertaking its post-announcement/pre-Merger due diligence. In response, Defendants repeatedly falsely reassured investors that they had thoroughly assessed CB&I's business, particularly the Focus Projects, that they understood the risks of those Focus Projects, and that they had appropriately valued the Merger and accounted for the Focus Projects. For instance, during the February 22, 2018 earnings call, Defendant Dickson gave reassurances, which were repeated by analysts in their reports thereafter:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional project charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.***

132.    On April 12, 2018, prior to the open of trading on the NYSE, as part of the proxy solicitation process, CB&I issued a press release reporting preliminary first quarter 2018 financial results. The press release reported a range of operating results that CB&I "expect[ed] to report." The press release reported that CB&I did not incur any material project changes to the Focus Projects in the first quarter 2018 and stated that "CB&I's preliminary results reflect:"

> ***Excellent operating performance across the company's portfolio of projects, including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project,*** which respectively reached 84%, 82% and 84% completion and incurred no material project changes during the quarter.

133.    On April 12, 2018, as part of the proxy solicitation process, McDermott provided its shareholders with an operational update for the quarter ended March 31, 2018, and reaffirmed its 2018 guidance originally issued on January 24, 2018, as previously reaffirmed on February 21,

2018. McDermott and the Defendants, as part of their due diligence, would have reviewed CB&I's April 12, 2018 press release and CB&I's underlying analyses and either knew or recklessly disregarded that CB&I had under-accrued for losses on the Focus Projects.

134.    Analysts viewed CB&I's quarterly results reflecting no charges to the Focus Projects positively and as supportive of the Merger. Credit Suisse wrote in an April 12, 2018 analyst report titled "MDR-CBI Preannounce: Working Miracles," that "A clean quarter from CBI and a beat from MDR is a positive surprise and certainly timely given concerns the deal was at risk." In another analyst report issued on April 12, 2018, Deutsche Bank stated: "we are encouraged that the MDR/CBI merger story has somewhat de-risked" and noted that the Focus Projects were now "under control." Similarly, in an April 17, 2018 analyst report, Pareto stated that: "CB&I also released a PW on April 12th, which included no one-off charges on its four focus projects, which is a positive indicator for ongoing execution risk."

135.    On April 16, 2018, McDermott issued a further letter to shareholders that was filed with the SEC pursuant to Rule 425 and was part of the proxy solicitation process.

136.    McDermott falsely assured investors as to its ongoing due diligence and the benefits of the Merger:

> We believe that, together, McDermott and CB&I will span the entire value chain from concept to commissioning, *deliver compelling value,* be more competitive and *deliver more consistent, predictable performance* through market cycles.
>
> In addition to being underpinned by a compelling strategic rationale, *the combination is also expected to deliver substantial financial benefits for stockholders.* Together, McDermott and CB&I will have significantly enhanced backlog and pro forma combined revenues, adjusted EBITDA and adjusted net income. The companies have reaffirmed the anticipated $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019, and have identified potential incremental savings of $100 million.

137.    On April 23, 2018, prior to the opening of trading, CB&I issued a press release announcing financial results for the first quarter of 2018. CB&I reported a 78 percent increase in

net income versus the year-ago quarter, including "[solid operating performance in Fabrication Services, Technology, and E&C Groups, including no material charges on Cameron LNG, Freeport LNG and Calpine power projects." CB&I did not hold a first quarter earnings conference call, it stated, "due to [the] pending combination with McDermott."

138.   The Form 10-Q filed by CB&I on April 24, 2018, included a discussion of the Cameron Project, which noted that "[t]he project was approximately 84% complete and had a reserve for estimated losses of approximately [$13 million] at March 31, 2018."

139.   On April 24, 2018, as part of the proxy solicitation process, McDermott issued a press release reporting first quarter 2018 operating results attached to a form 8-K signed by Spence and filed with the SEC. The headline of the press release read: "Strong Start to 2018 Driven by One McDermott Way." With respect to the proposed acquisition of CB&I, the press release added that the parties had identified an additional $100 million of synergies anticipated from the Merger.

140.   That same day, McDermott attached a presentation titled "Q1 2018 Supplemental Information" to the same Form 8-K. On a slide titled "Post-Combination Synergies Identified," McDermott states that there are $350 million in total synergies, with $153 million in the supply chain, $93 million in G&A, $77 million in operations, and $27 million in other cost-cutting measures.



141.   Also on April 24, 2018, McDermott conducted a conference call with investors as part of the proxy solicitation process to discuss the first quarter operating results. On the call, Defendant Dickson emphasized that McDermott's Board had rejected Subsea 7's "highly contingent" offer because the CB&I Merger presented a more "attractive alternative":

> This highly conditional proposal was subject to amongst other things, the termination of our combination with CB&I. McDermott's board carefully reviewed and considered the proposal in consultation with its outside financial advisors and legal counsel. The board concluded that the proposal was not in the best interest of the company or its stockholders as it significantly undervalued McDermott and was not an attractive alternative to our pending combination with CB&I.
>
> ****
>
> **We're very confident of the combination** and we're going to continue on the same path.

142.   Dickson also stated on the conference call that since the December 2017 announcement of the Merger, the parties had worked closely together and that "[t]ogether, we can provide certainty, innovation and added-value to energy projects around the world."

49

> *We have spent a great deal of time with CB&I since we initiated this effort last summer and are more enthusiastic than ever about the opportunities this combination will offer to our customers.* Together, we can provide certainty, innovation and added-value to energy projects around the world. And together, our complementary market positions and geographical footprint will create new opportunities for revenue growth and we will be more competitive and better able to deliver consistent predictable performance through market cycles.

> *As we've gotten to know CB&I better over the last 10 months*, we've seen first-hand, how this company values quality, innovation, safety and its employees, and more importantly, we have witnessed how it puts customers first. That is why coming together makes sense, and we are really excited about what's next.

143.  With respect to CB&I's long-term construction contracts, Dickson falsely assured investors that McDermott, through its due diligence, had mitigated the risk to McDermott:

> We also note that CB&I reported results for Q1 2018 yesterday. CB&I reported excellent operating performance across its portfolio of projects *including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project*

> These projects respectively reached 84%, 82% and 84% completion and incurred no material project charges during the quarter. Through our integration planning process, *we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio.*

These statements indicated Defendants' familiarity and comfort with the degree of completion on the Focus Projects and, therefore, the costs incurred and to be incurred in completing the Focus Projects.

144.  When asked about the Freeport Project, Dickson gave assurances to investors: "That was all known as we went through the due diligence and it's all subject to insurance, it is a force majeure situation and CB&I are working with the customer getting through that, but all in all, I would again emphasize that in our view, *Freeport is a good project*."

145.  After receiving Defendants' repeated reassurances that McDermott had controlled for the risk, and shortly after McDermott rejected the conditional bid from Subsea 7, the Merger

was submitted to a vote of McDermott shareholders on May 2, 2018.  On May 10, 2018, the Company announced that McDermott shareholders had overwhelmingly approved the Merger with CB&I. Of the approximately 285.9 million shares eligible to vote, 219.3 million shares participated in the vote, of which 209.2 million shares voted in favor of the Merger (approximately 95.4% of the shares participating in the vote), 9.8 million shares voted against the Merger, and 227,000 shares abstained. As a result of the Merger, McDermott stockholders owned approximately 53% of the combined business on a fully diluted basis, and CB&I shareholders owned approximately 47%.

146.    The Merger closed on May 10, 2018 (the "Merger Date").  McDermott issued approximately 84.5 million shares to former CB&I shareholders with a market value (based on the $20.70 per share closing price on the Merger Date) of approximately $1.75 billion.

147.    The foregoing misstatements made during the proxy solicitation process during May 2018 were materially false and misleading, *inter alia,* for the reasons stated in ¶¶ 148-169; 206-267 below.

### D.    Every Aspect of the Defendants' Disclosures Regarding CB&I and the Merger Was Permeated by Fraud

148.    McDermott's disclosures regarding McDermott's purported pre-Merger due diligence, the purported benefits of the Merger, the business of CB&I, and the Four Focus Projects were permeated by fraud, both in the form of knowing misstatements and misleading omissions of facts requiring disclosure. Overarching components of the fraud were (a) McDermott's misrepresentations regarding due diligence purportedly done in advance of the Merger (the "Due Diligence Fraud"), (b) the overstatement of the fair value of the Focus Projects and the concealment of massively higher undisclosed costs that were internally forecast to incur and (the "CB&I/Focus Project Fraud"), and (c) the concealment of the dire impact of the acquisition of the

Focus Projects on the capital structure and liquidity of McDermott (the "Capital Structure and Liquidity Fraud".)

### 1.    *The Fraudulent Claims Regarding the Adequacy of Due Diligence*

149.    The Due Diligence Fraud involved Defendants' misstating the depth, scope and quality of McDermott's pre-Merger due diligence conducted of CB&I and, specifically, the Focus Projects. Contrary to Defendants' statements, McDermott's due diligence into the Focus Projects was fundamentally inadequate. Defendants knew of both (i) the inadequacy of the diligence McDermott performed, and (ii) the misleading nature of McDermott's counterfactual post-Merger assurances that pre-Merger due diligence had been adequate.

150.    As alleged herein upon information and belief, McDermott failed to conduct adequate due diligence in what turned out to be less than a three-month period to do so—and misled investors with respect to the extent of such diligence.[2] Specifically, the first meeting between McDermott and CB&I took place on or about July 25, 2017, during which "no specific transaction terms were proposed." Next, on August 15, 2017, the parties signed an NDA. On August 25, 2017 McDermott's board was informed that it had entered discussion to plan for mutual due diligence with CB&I.

---

[2] In the alternative, as set forth in the pending class action lawsuit in the Southern District of Texas (*Edwards v. McDermott International, Inc. et al*, 18-cv-04330), Defendants knew of or recklessly disregarded the problems plaguing the Four Focus Project both during and after the periods during which it performed due diligence in late 2017 and 2018. Notwithstanding the inadequacy of McDermott's due diligence, Defendants cannot credibly deny falsely mischaracterizing their understanding of the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and risk factors of the Four Focus Projects, even before the Merger closed. Either by falsely misstating the extent and nature of its due diligence, or by choosing to ignore the Focus Projects' problems, or by missing or misstating them altogether, Defendants deceived investors, including Plaintiffs. Under either theory, Defendants' representations to the market, including Plaintiffs, were misleading, and caused significant damages to investors, including Plaintiffs.

151.   *Less than two weeks* later, on September 13, 2017, McDermott and CB&I met in Houston, and the parties set out a non-binding proposal for a combination.  *Less than three months* later, the Merger Agreement was formally executed.

152.   On the Merger Date, Defendant Spence falsely remarked "we have dedicated a significant amount of time performing joint due diligence together with CB&I's team. We've gotten to know one another's operations very well. In particular, McDermott has performed a great deal of due diligence on CB&I's IPL, Eagle Valley, Calpine, Freeport and Cameron projects [*i.e.*, the Four Focus Projects]. We feel confident that we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects."

153.   Despite the brevity of the period during which McDermott purportedly performed due diligence, the Board approved the deal over the dissenting vote of one board member, who specifically reflected, "have we done enough due diligence?" after the deal closed.

154.   Indeed, McDermott itself admitted that this three-month period was "very short" and that McDermott performed "shorter than ideal due diligence."

155.   After the board formally approved the Merger, McDermott released a number of public statements that falsely amplified the extent to which McDermott had performed its diligence efforts before agreeing to the Merger.

156.   The foregoing misstatements regarding the extent of McDermott's due diligence were materially false and misleading, *inter alia,* for the additional reasons stated below in ¶¶ 166-169.

**2.**     ***The CB&I/Focus Project Fraud, Undisclosed Costs, and the Technology Business***

157.   The CB&I/Focus Project Fraud involved a misstatement of the benefits of the Merger due to the substantially higher undisclosed costs that the Focus Projects were internally

forecast to incur and by an overstatement of the fair value of those projects in that Defendants improperly "assumed that the fair value" of those projects as of the Merger Date was "equal to their carrying values."

158.   Simultaneously—either by reckless disregard for these facts, or concealment—Defendants misrepresented the true and ongoing costs of these delayed and over-budget projects, the risks they posed, and the benefits and synergies to McDermott of the Merger with CB&I, versus alternative potential deals with CB&I (such as a purchase of only its Technology Business) or with other entities (such as Subsea 7).

159.   McDermott's fair value adjustments to the Focus Projects above were false and misleading because McDermott recklessly disregarded information from readily available core documents or failed to properly assess the risks and costs of the Focus Projects, despite representing to shareholders the performance of due diligence sufficient to assess the risks and costs of the Focus Projects. Furthermore:

(a)    Upon information and belief, CB&I had misrepresented the true costs of and risks of the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." Upon information and belief, by February or March 2017, Cameron was already $300 million over budget and company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. Upon information and belief, by November 2017, Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, and the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. Further, upon information and belief, Freeport was close to being $1 billion over budget (though not yet over project costs) by November

2017. By December 2017, forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. Upon information and belief, concerns over unreported costs prompted resignations and transmission of an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. Upon information and belief, these overages were due to longstanding, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b)    Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to improve the optics of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(c)    As later revealed to investors, including Plaintiffs, due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to the Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects due to cash burn associated with the execution of the distressed Focus Projects and the need to incur significant, ongoing costs. These charges were required based on information available as of the Merger Date, and were wrongfully delayed by Defendants until after the Merger Date. The combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, leaving it desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

### 3.    *The Capital Structure and Liquidity Fraud*

160.    Before the Merger closed in May 2018, McDermott misstated the extent to which the Focus Projects would present McDermott with growth opportunities and liquidity.

161.    On March 22, 2018, in a 51-page presentation,  McDermott detailed its liquidity and capital structure. McDermott stated, on a slide titled "A Transformational Combination" that the Merger "Provides capital structure with liquidity to fund growth and manage downside scenarios." A later slide titled "Financing" said that "Sufficient funded debt being raised to strengthen balance sheet and provide liquidity to manage working capital needs, timing and focus projects."

162.    Further, the Proxy Statement contained the following false and misleading statements:

> After the Combination, McDermott expects to have a strong capital structure to support growth. The combined business is expected to generate EBITDA growth and strong free cash flow, enabling a reduction in funded indebtedness over the next few years.

163.    On April 24, 2018, McDermott filed a Form 10-Q with the SEC for the first quarter of 2018 (the "Q1 2018 10-Q"), SOX certified by Defendants Dickson and Spence, which included the following statement about liquidity: "We believe our anticipated future operating cash flow, capacity under our credit facilities and uncommitted bilateral lines of credit, along with access to surety bonds, will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our normal, anticipated working capital needs for the foreseeable future."

164.    The foregoing misstatements were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Falsely touting McDermott's "diligence" into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could

manage those projects to successful conclusion and that the cost estimate increases and ongoing

burn rate of those projects, which were materially understated, had been within the scope of their

diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's

post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently

stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt

service, and maintain a sustainable capital structure, even as McDermott was heading towards an

undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the

Four Focus Projects about which Defendants knew well in advance, constituted fraudulent

conduct.

### E.    Post-Merger Misstatements & Omissions

165.    The Defendants' statements, disclosures and conduct post-Merger were fraudulent

as well, as alleged below.

#### 1.    *The Post-Merger Statements Concerning McDermott's Overstated Due Diligence Efforts*

166.    After the board formally approved the Merger, McDermott released a number of

public statements throughout 2018 and 2019 that falsely amplified the extent to which McDermott

had performed its diligence efforts before agreeing to approve the Merger.

167.    Moreover, when Plaintiffs met with Spence shortly after the closing of the Merger,

on or about June 18, 2018, Spence falsely represented to Plaintiffs that he was personally "very,

very involved with diligence" and that he had been "living and breathing this deal since last

summer." Spence further represented that he had taken McDermott's internal head of project

management control and several "handpicked" people and had this group pour through all of

McDermott's data on the CB&I projects and had reviewed with CB&I's head of "project

execution" CB&I's portfolio in depth. Spence further falsely represented that, while he had done

only a "couple of site visits," he "got to a position where we understood their portfolio and backlog well," stating that "you can get 80% backlog coverage if you look at just 14 projects: the focus 4 and 10 others."  Spence further misrepresented to Plaintiffs that "as a portfolio, risk was normal for onshore jobs and tracking to the numbers the company contemplated when bidding" and that "the overall portfolio was doing quite well with no significant outsized risks in the other 10 projects." Spence told Plaintiffs that post-announcement of the proposed Merger, "visits were a little top-down, but talking to the project directors allowed us to get another layer down." He claimed that "we saw nothing new in this phase that we did not see in our earlier diligence."  Post-closing, Spence maintained, at this meeting on or about June 18, 2018, that there had not been "any incremental swing in the projects" and that "nothing incrementally [had occurred] plus or minus."

168.    As with McDermott's disclosures to other investors, Spence's statements to Plaintiffs were misleading and failed to disclose the insufficiency of McDermott's due diligence. Spence assured Plaintiffs that he and Defendant Dickson, in fact, were going to spend significant time later that day "review[ing] all four of the Focus Projects."

169.    Indeed, notwithstanding the story that had been pitched to investors that McDermott had done "extensive" due diligence before the Merger closed, when reflecting in August 2019 (while McDermott was in freefall toward bankruptcy) on the extent of McDermott's due diligence, McDermott's Chairman admitted that an unfortunate aspect of the McDermott-CB&I deal was, at least with respect to the Technology Business, that there was inadequate time to complete diligence, and that the banks were closing in on CB&I, and that the only way for CB&I to survive was to quickly sell its Technology Business, leading to a situation in which McDermott was forced to conduct inadequate due diligence.

2. ***The Post-Merger Statements Concerning the Focus Projects' Forecasted Costs***

170.    On July 31, 2018, McDermott issued a press release with Q2 2018 financial results, and filed it as an exhibit in a Form 8-K with the SEC that was signed by Defendant Spence. McDermott reported a $221 million change to the estimated costs associated with three projects it had acquired from CB&I: Cameron, IPL and Calpine. McDermott, in relevant part, stated:

> In accounting for the acquisition of CB&I on May 10, 2018, McDermott recorded the fair value of the CB&I balance sheet, including identified intangible assets and updated cost estimates on the acquired backlog. The vast majority of the acquired portfolio did not require material changes to cost estimates. However, McDermott did record changes in estimated costs on three projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on the Company's net income for the second quarter.

> "We are clearly disappointed with the increased cost estimates for three of the legacy CB&I projects," said Dickson. "***The increases are within the bounds of the scenarios we contemplated during our due diligence,*** and ***we believe that by applying our disciplined One McDermott Way to these projects, we can bring them to successful completion.*** We have already made significant changes to personnel, reporting structures, stakeholder relationships and execution plans on Cameron, for example, since the combination closed, and there are encouraging signs that these changes have made a difference. More importantly, we have moved forward to further strengthen our relationships with stakeholders. Going forward, we plan to continue to aggressively apply our McDermott approach to ensure appropriate risk evaluation and mitigation across the combined Company's portfolio—from bidding to execution."

171.    In that press release, Defendant Dickson is also quoted as saying:

> We remain confident in the fundamental soundness of the acquired backlog. ***Our project portfolio as a whole is being executed efficiently and progressing well, specifically through implementation*** of the One McDermott Way, which has been a proven contributor to our success in recent years. Today we also announced our initial guidance as a combined Company for the second half of 2018, which we believe demonstrates the strategic rationale of the combination[.]

172.    The foregoing misstatements were materially false and misleading due to McDermott's failure to fully and accurately account for the Focus Projects, and by continuing to underreport the cost estimates for the projects.

173. Moreover, McDermott did not disclose in the Proxy Statement that McDermott had contemplated as much as $200 million in negative changes in estimated costs for these three legacy CB&I Focus Projects during due diligence. Indeed, the second quarter 2018 charges raise the question why no fair value adjustments had been made in the Proxy Statement pro forma financial statements. Defendants' July 31, 2018 statements establish that Defendants—either by reckless disregard for these facts, or concealment—failed to disclose the need for additional charges to CB&I's financial statements as of March 27, 2018, and certainly no later than the May 2, 2018 shareholder vote.

174. That same day, McDermott filed with the SEC their 10-Q for the second quarter of 2018 (the "2Q 2018 10-Q"), SOX certified by Defendants Dickson and Spence. McDermott stated that the Cameron LNG project, as of June 30, 2018, "was approximately 23% complete on a post-Combination basis (approximately 88% on a pre-Combination basis) and had a reserve for estimated losses of approximately $32 million" and that the Calpine Power Project, as of June 30, 2018, "was approximately 28% complete on a post-Combination basis (approximately 89% on a pre-Combination basis) and had a reserve for estimated losses of approximately $42 million." McDermott went on to say "[t]here were no other material active projects as of June 30, 2018 in a substantial loss position." Also, Page 16 of the 2Q 2018 10-Q disclosed a purchase price adjustment: "Note (2) Advance billings on contracts includes provisions for estimated losses on projects of $112 million."

175. Page 19 of the 2Q 2018 10-Q, under the heading "Loss Projects" stated as follows:

Included in the Combination were three projects in a substantial loss position at the Combination Date. The loss positions include our changes in cost estimates of $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on our net income for the three months ended

June 30, 2018 as the impact of their changes in estimates were included as adjustments to the fair value of the ***acquired balance sheet date.***

176.    In the 2Q 2018 10-Q, McDermott also said:

In accounting for the acquisition of CB&I on May 10, 2018, we recorded the fair value of the CB&I balance sheet, including updated estimates on the acquired RPOs. The vast majority of the acquired portfolio did not require material changes to cost estimates. However, we did record changes in estimated costs on three loss projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. ***These changes in cost estimates did not have a direct impact on our net income for the three months ended June 30, 2018.***

177.    McDermott's July 31, 2018 earnings call with analysts (the "7/31/2018 Earnings Call"), to discuss 2Q 2018 results, which Plaintiffs participated in, contained the following false and misleading statement from Defendant Spence: "We believe that the vast majority of the acquired portfolio is fundamentally sound, is being executed well and as such ***did not require a material change in cost estimates***."

178.    McDermott admitted that the facts and circumstances which led to these new purchase price adjustments existed prior to the closing of the Merger. Analysts, held out hope  that the announced negative news about changes in estimated costs were a one-time event. A UBS analyst report on July 31, 2018 noted that "some may see it as 'kitchen sinking' of the projects for MDR management to clear the deck going forward." Deutsche Bank echoed these sentiments in a July 31, 2018 analyst report titled "Tossing Out the Kitchen Sink," noting that "Mgmt struck a confident tone as they laid out a detailed risk mitigation framework for managing the existing problem projects and bidding new onshore prospects...."

179.    McDermott participated in the Barclays Energy Power CEO Conference on September 6, 2018, attended by Plaintiffs. During the conference Defendant Dickson stated:

"***So regards to the integration, what I'd say today is that the integration process is probably ahead of where I would have anticipated when we closed the deal.*** So we have invested time, effort, money in really looking at how we bring together

these 2 companies. And we did that because we felt that there have been a number of M&A transaction over a number of years where culture was not developed or really approached by both organizations. So we really have spent a lot of time and effort on this."

180.    During a private meeting by Kingstown with Dickson and Spence during the Barclays Energy Power CEO Conference, Dickson made similar statements to Kingstown, falsely claiming that McDermott had properly handled integration of CB&I post-Merger, and failing to disclose the true costs and risks of the Focus Projects.

181.    On September 12, 2018, at the Pareto Securities 25th Annual Oil & Offshore Conference, McDermott presented a slide that stated there were no "Changes In Estimate ("Project Charges") Recorded in Q2 2018" for the Freeport and Cameron projects.

182.    Starting with additional statements made on October 30, 2018, McDermott continued to mislead analysts and investors, including Plaintiffs, up to the point where McDermott was on the brink of bankruptcy and its stock suffered a near-complete collapse, so severe that trading was repeatedly halted as the markets struggled to digest its downfall.

183.    McDermott muted the corrective effects of an October 30, 2018 press release by making additional false and misleading statements the same day to falsely reassure investors and buoy McDermott's stock price in the face of the negative revelations. But for these contemporaneous false and misleading statements and omissions, the corrective decline in McDermott's stock price would have been even greater.

184.    The October 30, 2018, Press Release further stated:

For the third quarter of 2018, McDermott recorded $744 million of changes in estimates on three projects, including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project and $68 million on the Calpine gas power project. Under the provisions of purchase accounting applicable to the Combination, these changes in estimates were reflected as a change in intangible assets, including goodwill, and, as a result, ***did not have a direct impact on the Company's net income for the third quarter.***

After five months of ownership, we now believe *we have a thorough and definitive understanding of the schedule and cost position on each of the projects - and clear visibility into the operational and financial path to completion*," said Dickson. "We have taken significant steps to address performance issues on the three projects. Specifically, we have installed a new executive leadership team - including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination - and made improvements in reporting structures, execution plans, forecast cost-base methodology and the flow of communication with our consortium members and customers. *We expect no further material changes in the cost estimates on these projects.*

185.    On October 30, 2018, McDermott filed its Form 10-Q with the SEC for the third quarter of 2018 (the "3Q 2018 10-Q"), SOX certified by Defendants Dickson and Spence, which stated that the Cameron LNG project, as of September 30, 2018, "was approximately 37% complete on a post-Combination basis (approximately 83% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $127 million." and that the Calpine Power Project, as of September 30, 2018, "was approximately 43% complete on a post-Combination basis (approximately 86% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $28 million."

186.    The following false and misleading statements also appeared in the 3Q 2018 10-Q:

Based on our assessment at September 30, 2018, included in the preliminary purchase price allocation for the Combination (see Note 3, Business Combination, to the Financial Statements) were four projects determined to be in substantial loss positions, which included the Cameron LNG, Freeport LNG Trains 1 & 2, Calpine and the now-completed IPL gas power projects. Based on our assessment at June 30, 2018, our Freeport LNG Trains 1 & 2 project was not estimated to be in a loss position; however, as a result of changes in estimates during the third quarter of 2018, the project is now estimated to be in a loss position at completion. Our Freeport LNG Train 3 project is not anticipated to be in a loss position. Changes since our initial preliminary assessments during the second quarter of 2018 reflect unfavorable changes in estimates of $482 million on the Cameron LNG project, $194 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $68 million on the Calpine project. *These changes in estimates did not have a significant direct impact on our net income for the three or nine months ended September 30, 2018, as the impact of the changes in estimates were included as adjustments to the fair values reflected in the acquired balance sheet*

187.   On an after-hours earnings call on October 30, 2018 (the "10/30/2018 Earnings Call"), which Plaintiffs participated in, after reiterating statements from the 10/30/2018 Press Release regarding changed leadership team and purported operational improvements for the CB&I projects at issue, Defendants made additional false and misleading statements. Defendant Dickson addressed the Cameron LNG Project in prepared remarks:

> We have now completed our first full quarter of ownership of CB&I, which has given us the ability to ***fully grasp*** the magnitude of the challenges associated with our legacy Focus Projects and to complete a comprehensive portfolio review.
>
> * * *
>
> First to address concerns about Cameron and the other two Focus Projects, including the feedback from investors that these projects represent an overhang in our stock price, ***we have taken steps to significantly improve the way we are managing the projects and the way we are interacting with our customers and our consortium partners.***
>
> * * *
>
> ***[W]e expect no further material changes in the cost estimates on the legacy Focus Projects, which we believe have been significantly and incrementally de-risked*** as compared to where we were in Q2 [2018].
>
> * * *
>
> Specifically on Cameron, our confidence in the path forward is now bolstered by three things. First is a productivity improvement initiative set out to identify ways to improve the execution plan. Second is a costs reduction plan that aims to review and improve the economics of our subcontractor and service relationships. Third is a revenue recovery plan through which we expect to obtain meaningful reimbursements from the customer for certain incremental costs.

188.   During a Q&A, analysts pressed Defendant Dickson on why they should put faith in McDermott's going-forward assessment of the CB&I projects:

> [Analyst]:       David, when you came to McDermott from Technip, you were able to get your arms around I think nine brown projects that McDermott had reasonably quickly. Why do you think that you haven't been able to get on top of Cameron and Freeport in particular? And why should the market - I mean, it's tough to ask this question, but ***why should the market believe you now*** that you have your arms around the project because in E&C we've tended to learn that once projects are bad,

they tend to be bad until after the first fire, so. And I know you've said all this stuff that you've done differently, but maybe help us understand why this really is it?

[Dickson]:      [L]et me go back to the McDermott story. The nine loss-making projects I think I first disclosed it to the Street about four months after I joined, here obviously we're getting close to six months. But obviously the scale and the size of these projects are considerably larger than what we've seen. I think in particular in Cameron the challenge we've had is, having to unwind what was a pure execution and strategy by CB&I and so that's taken a bit more time. And then obviously mobilize the stronger teams and the stronger executive oversight has just taken a little bit longer. The additional item here which you can't blame the past is the situation around the availability and quality of construction labor, specifically to the Lake Charles area, and that's resulted in this significant increase in cost.

Now come back to answer your question, what would give confidence in these projects? So if we look at the work that we have done. On the estimate, and I'm going to specifically talk about Cameron, because that's the bigger one. ***So on Cameron, we've done the cost estimate based on a number of methodologies from top down, bottom up, having the teams, let's say, invest - really spending time and building up the cost and schedule.*** We also today, and I won't disclose where they are but are using productivity factors in certain trades, which are numbers which sometimes are difficult to understand because they're so low. So ***we've taken a very, what I'd call, prudent position with regards to productivity.***

Now we've been spending a lot of time on building up the cost estimate to go and what I was trying to make clear on my opening remarks is now we've shifted away from containing the cost to say, hey, how do we reduce these losses, so in Cameron, we had $1.5 billion of loss, that loss does not include any productivity improvement that we're looking to see, where we can make changes, does not include any cost improvements that we could make and a significant part of what's happening in Cameron today is subcontract. And we also haven't included any cost recovery from our customer, and we're starting to engage discussions with our customer. And in particular, Cameron to get to the $1.5 billion loss, we actually unwind some incentives that had been included in the estimate.

So whilst we talk about the cost, the losses today in Cameron, we haven't included for any upside, resulting from those three initiatives. Secondly, I tried to indicate in my remarks is that, as we look to Cameron, we also benchmarked it against Freeport, and as we look at those two projects today with the estimated cost of completion, these are benchmarking very closely together, so that gives us even further confidence is that, we're getting to the end of where these projects would go. But today, our more focus is on to recover the cost, reduce the cost rather than contain the cost.

189.    The foregoing misstatements on October 30, 2018, which muted the effect of the

corrective disclosure that day, were materially false and misleading because they continued to

understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity.

190.   McDermott filed their Form 10-K for the year 2018 with the SEC on February 25, 2019 (the "2018 10-K"), and it was signed, and SOX certified by Defendants Dickson and Spence. The following statements about completion rates appeared:

> ***Cameron LNG***—At December 31, 2018, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) ***was approximately 50% complete on a post-Combination basis (approximately 85% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $185 million.***
>
> \*\*\*\*
>
> ***Freeport LNG***—At December 31, 2018, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) ***were approximately 64% complete on a post-Combination basis (approximately 91% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $26 million.***
>
> \*\*\*\*
>
> ***Calpine Power Project***—At December 31, 2018, our U.S. gas turbine power project in the Northeast for Calpine (within our NCSA operating group) ***was approximately 80% complete on a post-Combination basis (approximately 95% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $25 million.***

191.   The 2018 10-K also had the following false and misleading statements:

> We have had unfavorable changes in estimates of $815 million on the Cameron LNG project, $296 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $122 million on the Calpine project since the Combination Date, of which approximately $647 million, $296 million and $91 million, respectively, were included as adjustments to the fair values reflected in the acquired balance sheet for the Combination. ***The changes in estimates reflected in the acquired balance sheet did not result in a significant direct impact on our net income during 2018.*** The changes in estimates for the Freeport Trains 1 & 2 and Train 3 projects totaled approximately $102 million during the fourth quarter of 2018. The changes in estimates for the Cameron LNG and Calpine projects that were not reflected in the acquired balance sheet were recognized during the fourth quarter of 2018, and

resulted in charges of approximately $168 million and $31 million, respectively, to loss from operations during 2018.

192.    Also on February 25, 2019, McDermott released a press release with Q4 2018 and full year 2018 earnings results that was attached as an exhibit in a Form 8-K filed with the SEC and signed by Defendant Spence, which states:

Update on Estimated Costs on Selected Projects

For the fourth quarter of 2018, McDermott recorded a total of $199 million of changes in estimates on the Cameron LNG and Calpine Gas Turbine Power projects. The changes directly impacted McDermott's income statement for the fourth quarter. ***Expected completion dates for the projects are unchanged.***

Cameron LNG Project - ***Operationally, the project continues to progress well and in line with the schedule presented in the third quarter of 2018.*** The gas turbine solo run was completed ahead of schedule, cold circulation of hot oil in Train 1 was completed during the fourth quarter and flare ignition testing was successfully completed on all flares. All of these events are crucial steps in the commissioning of Train 1, and we expect to achieve a major milestone with feed gas into the facility in the first quarter of 2019. ***As of the end of the fourth quarter of 2018, the project was 85% complete and had approximately $445 million of McDermott's portion of expected revenues remaining until expected completion.*** During the quarter, the project contributed $116 million to revenues and used $39 million of cash flows from operations. ***Phase 1 of the Cameron LNG project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.*** The $168 million change in estimate resulted from unfavorable labor productivity and subcontract, commissioning and construction management costs.

Calpine Gas Turbine Power Project - First fire was achieved in December 2018, the steam blows have been completed successfully and systems have been turned over to commissioning. During the fourth quarter of 2018, the project contributed $3 million to revenues and used $28 million of cash flows from operations. As of the end of the fourth quarter of 2018, ***the project was 95% complete, and substantial completion is expected in March 2019.*** The $31 million change in estimate resulted from increased labor construction costs associated with achieving first fire and substantial completion.

Separately, McDermott recorded a change in estimate of $102 million on the Freeport LNG project in the fourth quarter of 2018. The change in estimate related primarily to McDermott's view of a reduction in the assumed recovery of the claim and liquidated damages estimates that were filed with the customer relating to damages sustained as a result of Hurricane Harvey. That claim was outstanding at the time of the Combination and, as a result, the reduction in the claim has been recorded under the provisions of purchase accounting as a change in intangible

assets. *As such, the change in estimate did not directly impact McDermott's statements of operations. Expected completion dates for the project are unchanged.*

Operationally, the project continues to perform well, with the completion of lube oil flushing of the propane compressors on Train 1 and beginning of the lube oil flushing on Train 2. As of December 31, 2018, Freeport LNG was approximately 88% complete and had approximately $411 million of McDermott's portion of expected revenues remaining until completion. During the fourth quarter of 2018, the project contributed $175 million to revenues and used $186 million of cash flows from operations. *Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.*

193.    McDermott held its earnings call with analysts to discuss 4Q 2018 and full year 2018 results on February 25, 2019 (the "2/25/2019 Earnings Call"). During the call, Defendant Spence made the following false and misleading statements:

As for the cadence of our earnings in 2019, we expect that Q1 is likely to be the softest quarter of the year and that the second half is likely to be stronger than the first half. This is in part due to three factors. First, *the cumulative benefit of cost synergies will grow increasingly evident as the year progresses.* Second, we will also expect to see diminishing revenues from the zero-margin focus projects as the year progresses. And third, the contribution from new awards that we booked earlier this quarter.

*Operating cash flow is similarly expected to be stronger in the second half, as we begin to see reduced outflows on the focus projects.* Other assumptions embedded in our guidance include an assumption of no material project charges, sound execution on the project portfolio, and a healthy pace of new orders, as supported by our revenue opportunity pipeline.

194.    The foregoing misstatements on February 25, 2019 were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity.

195.    On April 29, 2019 McDermott filed their Form 10-Q with the SEC for the first quarter of 2019 (the "IQ 2019 10-Q"), SOX certified by Defendants Dickson and Spence, which contained the following statements:

***Cameron LNG***—At March 31, 2019, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) ***was approximately 65% complete on a post-Combination basis (approximately 90% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $128 million.*** For these purposes (and for purposes of the discussion below), when we refer to a percentage of completion on a pre-Combination basis, we are referring to the cumulative percentage of completion, which includes progress made prior to the Combination Date. In accordance with U.S. GAAP, as of the Combination Date, we reset the progress to completion for all of CB&I's projects then in progress to 0% for accounting purposes based on the remaining costs to be incurred as of that date.

***Freeport LNG***—At March 31, 2019, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) ***were approximately 80% complete on a post-Combination basis (approximately 95% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $19 million.*** During the three months ended March 31,

2019, the project was negatively impacted by $27 million due to changes in cost estimates resulting from increases in construction and subcontractor costs. These cost estimate increases were partially offset by the recording of approximately $11 million of incentive revenues. Additionally, Freeport LNG Train 3 was positively impacted by $16 million of changes in cost estimates at completion due to increased productivity and savings in indirect costs, resulting in an overall net immaterial impact on operating margin at completion for the Freeport LNG project taken as a whole.

**\*\*\*\***

***Calpine Power Project***—At March 31, 2019, our U.S. gas turbine power project for Calpine (within our NCSA operating group) ***was approximately 95% complete on a post-Combination basis (approximately 99% on a preCombination basis), and the remaining accrued provision for estimated losses was not significant***

196.   Also on April 29, 2019, McDermott released a press release with IQ 2019 earnings results which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, in which the following false and misleading statements were made:

With our steady progress on both Cameron and Freeport during the first quarter of 2019, ***McDermott has taken important steps to demonstrate disciplined execution on these projects***," said David Dickson, President and Chief Executive Officer of McDermott. "The recent introduction of feed gas at Cameron was a major milestone in the commissioning of Train 1 and is the precursor for the production of liquefied natural gas. With the imminent completion of Train 1, as well as the initial work to commission Freeport Train 1, ***we are increasingly confident that the two facilities***

*will come fully on line in 2020 as world-class LNG producers. Further, we were pleased to report that we had no material increase in cost estimates on either project in the first quarter,* and we continue to progress our commercial discussions relating to Cameron.

197.    McDermott's analyst earnings call that same day, to discuss IQ 2019 results (the "4/29/2019 Earnings Call"), contained the following false and misleading statements from Defendant Dickson:

> Our performance in the first quarter of 2019 sets the stage for McDermott to fulfill the long-term promise of potential of our combination with CB&I As we anticipated and conveyed to you at the year end, we are benefiting from strong market positioning, favorable sector dynamics and a robust pipeline, all of which contributed to solid top line performance and will foster continued realization of the strategic rationale for the combination. These factors manifested in a number of positive trends that we expect, will continue to accelerate our growth trajectory into the year. The pace of new orders more than quadrupled as compared to Q4; backlog grew 41% sequentially to a level that exceeds the total of the two companies prior to the combination; *we completed our integration efforts and the full auctioning of the $475 million CPI program; and of course, delivered on our commitment to deliver disciplined execution of the Cameron and* Freeport projects with no material increases in cost estimates.
>
> ****
>
> [W]e expect to have a more attractive backlog profile on a go forward basis.
>
> We're doing essentially the same thing today, using a Playbook *to successfully complete the execution of the focus projects, while at the same time steadily building a book of new business at more predictable margins that will provide the foundation for our future earnings and cash flows. We are improving organizational efficiency and have established a capital structure that serves our needs over the intermediate term.*

198.    During that same call, Defendant Spence stated that:

> As we said in our earnings release, the Cameron and Freeport projects incurred no material changes in estimates during the quarter. As of quarter end, the Cameron project was about 90% complete with Phase 1, achieving mechanical completion during the period. Cameron Train 1 is scheduled for initial production of LNG this quarter.
>
> Initial production of LNG from Trains 2 and 3 at Cameron is set for Q1 of 2020 and Q2 of 2020, respectively. Our expectation of cash usage by Cameron for the full year 2019 is essentially in line with previous guidance of about $450 million.

The Freeport project progressed during the quarter reaching 93% completion. The project achieved a milestone earlier this month with FERC approval to bring in fuel gas for pre-commissioning of the pretreatment facility.

Freeport is scheduled for initial production of LNG as follows: Trains 1, 2 and 3 in Q3 2019; Q4, 2019, and Q1, 2020 respectively. ***Our expectation of cash usage by the Freeport project in 2019 is $33 million, which is modestly less favorable than previous guidance and is due largely to revised estimates of the timing of milestone payments. Said another way, the cash usage in Q1 was higher than expected, but we are forecasting the project to generate cash over the remaining nine months of this year.***

199.    Later in the 4/29/2019 Earnings Call, in response to an analyst question about

Freeport charges, Defendant Dickson said:

Yes, so if you look at the details in the Q, as you know, on the Freeport project, we are in a different consortium on Train 1 and 2 to Train 3, as we refined our estimates in the quarter, we increased marginally some cost on Train 1 and Trains 2, but given the productivity that we're seeing and the progress that we're seeing, we reduced our estimates on Train 3. ***So overall as a project there was no change in cost —*** total cost to complete for the entire project albeit with some POC accounting, with Trains 1 and 2, and a loss you take that amount and Train 3 gets kind of percentage of completion. ***So there was just a very-very minor immaterial net change for the quarter and the P&L, albeit for the entire project, we did not change our cost estimate for the project***

200.    The foregoing misstatements on April 29, 2019 were materially false and misleading

because Defendants continued to understate the true costs and necessary cash expenditures on the

Focus Projects, as well as the materially negative effect those projects were having on

McDermott's capital structure balance sheet, and liquidity.

201.    On July 29, 2019 McDermott filed its Form 10-Q with the SEC for the second

quarter of 2019 (the "2Q 2019 10-Q"), SOX certified by Defendants Dickson and Spence, in which

the following false and misleading statements were made:

***Cameron LNG***—At June 30, 2019, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (being performed by our NCSA operating group) ***was approximately 78% complete on a post-Combination basis (approximately 93% on a cumulative basis) and had an accrued provision for estimated losses of approximately $58 million.*** In the second quarter of 2019, NCSA project operating margin was positively impacted by recognition of

approximately $110 million of incentives related to the projected achievement of progress milestones.

*Freeport LNG*—At June 30, 2019, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (being performed by our NCSA operating group) *were approximately 87% complete on a post-Combination basis (approximately 96% on a cumulative basis) and had an accrued provision for estimated losses of approximately $19 million.* During the three and six months ended June 30, 2019, the project was negatively impacted by $27 million and $54 million, respectively, due to changes in cost estimates resulting from increases in construction and subcontractor costs. These cost estimate increases were partially offset by the recording of approximately $11 million of incentive revenues in the first quarter of 2019.

**** 

*Calpine Power Project*—At June 30, 2019, our U.S. gas turbine power project for Calpine (being performed by our NCSA operating group) *was approximately 99% complete on a post-Combination basis (approximately 99.7% on a pre-Combination basis), and the remaining accrued provision for estimated losses was not significant*

202.    Also on July 29, McDermott held an earnings call to discuss 2Q 2019 earnings (the

"4/29/2019 Earnings Call"). Defendant Dickson made the following false and misleading

statements:

> let me emphasize once again that the long-term outlook for McDermott is exceptionally positive. *We are optimizing the benefits of our combination with CB&I and steadily advancing toward completion of the Cameron and Freeport LNG projects.* We remain confident in the earnings power of the company, and the adjustment in our current year guidance is largely a reflection of Q2 actions and subsequent timing related issues. *We are confident now that the challenges we have confronted since the combination with CB&I, will be largely behind us by the end of the year* and we look forward to a significantly improved 2020. Although we are not prepared to give specific earnings guidance for next year, let me cite the specific factors that support our optimistic view of 2020.

> First, we should capture, not only the revenues and earnings that we previously expected to see in Q4 of this year, but we should see a much higher revenue run rate based on the growth in backlog and a corresponding reduction in unallocated operating expense.

> Second, we would expect to see a sharp reduction and eventual elimination on zero margin revenues from our existing project portfolio, as we complete the Cameron and Freeport LNG projects.

Third, we believe our backlog is sound and profitable *and we would not expect to incur material changes in project estimates across our portfolio.*

203.    On July 30, 2019, McDermott released a press release with its 2Q 2019 earnings results which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, and which had the following statements from Defendant Dickson:

> "This is a year of transition as we position McDermott to *fully optimize the benefits of our combination with CB&I and as we steadily advance toward completion of the Cameron and Freeport projects,"* added Dickson. "Nevertheless, the company today has updated its guidance for 2019. The reduction in our guidance is due to four main factors: 1) the weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA operating segment; and 4) a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives on the Cameron LNG project. Even so, *we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020.*

204.    On July 31, 2019, McDermott hosted a breakfast meeting with analysts, during which Defendants falsely stated that McDermott remained confident that the CB&I backlog will be significantly de-risked by the end of the following year as Cameron and Freeport's Train 1 are commissioned, and Train 2/3 (of both projects) remained on schedule.

205.    The foregoing misstatements on or about July 30 and 31, 2019, were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity.

### 3.    *The Post-Merger Statements Concerning the Technology Business*

206.    Defendants deceived investors, including Plaintiffs, about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while

concealing that the Technology Business was the key valuable asset of CB&I, and the rest of their portfolio dragged the whole of the business down.

207.    After the closing of the Merger, McDermott continued to tout the technology portfolio as an instrumental part of its growth and success strategies both pre- and post-Merger, particularly as to pull-through opportunities provided by the Technology Business.

208.    On July 31, 2018, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on second quarter 2018 financial and operational results, stating:

> McDermott's operating income and operating income margin for the second quarter of 2018 were $49 million and 2.8%, reflecting the net impact of transaction-related items. Adjusted operating income for the second quarter of 2018 was $172 million, primarily driven by offshore and downstream projects. The ***adjusted operating income margin was 9.9%,*** aided by ***strong margin performance*** in the APAC, MENA and ***Technology segments.***
>
> ****
>
> Revenue of $105 million and operating income and margin of $25 million and 23.8%, respectively, in the Technology segment for the second quarter of 2018 were driven by balanced activity across the portfolio of refining and petrochemical licensing and heat transfer equipment, aided by several large catalyst shipments.

209.    McDermott filed with the SEC its Form 10-Q for Q2 2018 (the "Q2 2018 10-Q") on July 31, 2018 and was signed and SOX certified by Defendants Dickson and Spence, discussing an overview of the combination completed on May 10, 2018, the reorganization of operations into business segments and the results of operations, stating:

> We are now a fully integrated provider of EPCI and technology solutions to the energy industry and design and build end-to-end infrastructure and technology solutions, from the wellhead to the storage tank, to transport and transform oil and gas into a variety of products.
>
> ****
>
> Technology—***Our Technology segment is a leading technology licensor of proprietary gas processing, refining, petrochemical and coal gasification***

74

*technologies* as well as a supplier of proprietary catalysts, equipment and related engineering services. ***These technologies are critical in the refining of crude oil into gasoline, diesel, jet fuel and lubes, the manufacturing of petrochemicals and polymers, as well as the gasification of coal into syngas.*** Technology also has a 50% owned unconsolidated joint venture that provides proprietary process technology licenses and associated engineering services and catalysts, primarily for the refining industry.

210. The Q2 2018 10-Q also disclosed the significant impact the technology segment had

on revenues and operating income for the three months ended June 30, 2018 as follows:

Technology - Revenues in the second quarter of 2018 were $105 million (all of which resulted from the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and the sale of catalyst.

**\*\*\*\***

***Our second quarter 2018 operating income benefited by $74 million from the impact of the Combination (including $22 million of project related and other intangible assets amortization), primarily within our NCSA and Technology segments.***

Technology - Segment operating income in the second quarter of 2018 was $25 million, net of $13 million of project related and other intangible assets amortization. The results were primarily associated with licensing and proprietary equipment activity, as well as the supply of catalyst and included $3 million of income from our CLG unconsolidated joint venture.

211. The Q2 2018 10-Q also disclosed the significant impact the technology segment had

on revenues and operating income for the six months ended June 30, 2018 as follows:

Our revenues for the 2018 period benefited by $1.1 billion from the impact of the Combination, primarily within our NCSA, MENA and Technology segments.

**\*\*\*\***

Technology - Revenues during the six months ended June 30, 2018 were $105 million (all of which resulted from the impact of the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining market and the sale of catalyst.

**\*\*\*\***

Technology - Segment operating income during the six months ended June 30, 2018 was $25 million, net of $13 million of project related and other intangible assets

amortization. The results were primarily associated with licensing and proprietary equipment activities, as well as the supply of catalyst, and included $3 million of income from our CLG unconsolidated affiliate.

212.   On July 31, 2018, McDermott held a conference call with analysts (the "7/31/2018 Earnings Call") regarding its Q2 2018 earnings release, on which Defendants Dickson and Spence discussed the first quarterly report for the combined organization. In prepared remarks, Defendant Dickson stated:

> We believe our integrated end-to-end offering enables us to deliver a more robust value proposition to our customers and in turn generates the opportunities for revenue synergies across all global density markets and ***incremental pull-through revenue from Lummus Technology.***
>
> ****
>
> ***In our Technology business, we have a leading position among the world's licensors of petrochemical and refining technology.*** In fact, around ***40% of the world's ethylene capacity is produced under licenses that were sold by our Technology business.*** The market for petrochemical and refining Licensing continues to be strong.

213.   Also, on the 7/31/2018 Earnings Call, in his prepared remarks, Defendant Spence attributed the strong results of the operating income to the Technology Business, stating:

> Operating income for the quarter was $49 million or $172 million, excluding the $123 million of transaction costs, CPI costs, and intangibles amortization. The ***adjusted operating income margin*** was just under 10%, ***driven largely*** by solid execution across our portfolio and the ***strong margin performance*** in our APAC, MENA and ***Technology segments.***

214.   In McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule A, on August 10, 2018, McDermott stated that strategic objectives included "***growing] revenue and earnings*** and...steadily expanding our EPC portfolio in petrochemical and refining by capitalizing on ***pull-through opportunities provided by our technology business"*** and ***expanding  "our leadership position*** in served markets and ***technology***."

215.   On September 6, 2018, Defendant Dickson spoke at the Barclays CEO Energy-Power Conference and McDermott published a 30-page slide deck in conjunction with this event touting the Company's "tier 1" "market-leading technology portfolio" stating that it

> "Generates steady and attractive returns selling licenses/catalysts and significant pull-through for downstream projects," "Longer term, this business segment will house all of the technology that underpins McDermott's business" and that a 2018 Focus Area was to "Complete integration successfully to establish top tier, vertically integrated EPC company, competitively differentiated in technology, customer relationships, culture and geographic footprint."

216.   On September 12, 2018, Defendant Dickson spoke at Pareto's Securities' 25th Annual Oil & Offshore Conference and McDermott published a 30-page slide deck in conjunction with this event, stating, "**_Lummus Technology provides competitive differentiation and uniquely positions us for pull-through EPC work._** "

217.   McDermott filed with the SEC its Form 10-Q for Q3 2018 (the "Q3 2018 10-Q") on October 30, 2018 and was signed and SOX certified by Defendants Dickson and Spence, which disclosed the significant impact the technology segment had on revenues and operating income for the three months ended September 30, 2018 as follows:

> Technology - Revenues in the third quarter of 2018 were $148 million (all of which resulted from the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets.
>
> ****
>
> Our third quarter 2018 operating income benefited by $121 million from the impact of the Combination (including $68 million of project related and other intangible assets and investment in unconsolidated affiliates related amortization), primarily within our Technology and NCSA segments.

218.   The Q3 2018 10-Q also disclosed the significant impact the technology segment had on revenues and operating income for the nine months ended September 30, 2018 as follows:

> Our revenues for the 2018 period benefited by $2.8 billion from the impact of the Combination, primarily within our NCSA, EARC, MENA, and Technology segments.

****

Technology - Revenues during the nine months ended September 20, 2018 were $253 million (all of which resulted from the impact of the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and the sale of catalyst.

****

The first nine months of 2018 operating income benefited by $194 million (including $90 million of project related and other intangible assets and investment in unconsolidated affiliates related amortization) from the impact of the Combination, primarily within our NCSA, MENA and Technology segments.

219.    On October 30, 2018, McDermott held a conference call with analysts (the "10/30/2018 Earnings Call") regarding its Q3 2018 earnings release, on which Defendants Dickson and Spence discussed the third quarterly report for the combined organization. In prepared remarks, Defendant Dickson discussed how integral the Technology Business was to McDermott's success stating:

> I'd like to offer a few comments on our **Technology business**, which **continues to generate terrific value for us. The segment posted very strong results with sequential quarter gains in all key metrics.** In particular, new orders quadrupled, backlog was up 26%, revenues increased by 41%, and adjusted operating income was up 66%.
>
> The technology license awards announced in the third quarter provided McDermott with an opportunity for the sale of additional products and services. On this point in particular, **we continue to view the Technology business as providing McDermott with a huge competitive edge and winning EPC contracts in the petrochemical and refining markets.** In the past five years alone, the company has won about **$8 billion of pull-through EPC work that resulted from the initial sale of technology licenses.**

220.    During the 10/30/2018 Earnings Call, in prepared remarks, Defendant Spence discussed reported results of the Technology segment stating:

> **The adjusted operating income margin** was 10.2% **aided by strong performance in the MENA and Technology segments"'**

****

In our Technology segment, revenues of $148 million and operating income of $20 million for the third quarter of 2018 were primarily driven by licensing and proprietary supply in the petrochemical and refining markets. Approximately, half of the revenue was attributable to proprietary supply, including catalysts. ***Operating income was positively impacted by strong execution progress, earned fees and process performance.*** Excluding the impact of intangibles amortization, adjusted operating income for the third quarter of 2018 was $63 million, representing an adjusted operating income margin of 42.8%.

221.   During the Q&A portion of the 10/30/2018 Earnings Call, as a follow-up question to the reasoning behind the announced sale of the pipe fabrication and tank storage business, an analyst asked whether McDermott was considering selling the Technology Business. In response, Defendant Dickson reassured the analyst that the technology segment was a core part of McDermott's business strategy going forward stating:

[L]et me just address the question on the technology and I tried to highlight it very strong on my opening remarks. ***The technology business is very core or very much core for our future.*** We've already seen a ***number of opportunities that have came up with the pull through of the technology through to the E&C and EPC business.*** And through our combination of both McDermott and CB&I, we're seeing excellent opportunities with regards to the capabilities of both companies and I refer to things such as modularization. ***So technology is very much part of our strategy moving forward.*** And as you heard on the call of business which today in the current market where we see increasing activity in petrochemical, less so in refining but will remain very core to our future.

222.   McDermott's Form 10-K for the year ended December 31, 2018, which was filed with the SEC on February 25, 2019 (the "2018 10-K") and was signed and SOX certified by Defendants Dickson and Spence disclosed:

Technology—***Our Technology segment is a leading technology licensor of proprietary gas processing, refining, petrochemical and coal gasification technologies*** as well as a supplier of proprietary catalysts, equipment and related engineering services. ***These technologies are critical in the refining of crude oil into gasoline, diesel, jet fuel and lubes, the manufacturing of petrochemicals and polymers, as well as the gasification of coal into syngas.*** Technology also has a 50% owned unconsolidated joint venture that provides proprietary process technology licenses and associated engineering services and catalysts, primarily for the refining industry.

****

Technology—Revenues during 2018 were $391 million (all of which was due to the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and the sale of catalyst.

223.   On February 25, 2019, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on fourth quarter and full year 2018 financial and operational results, and particularly regarding the technology segment stating, "Revenues of $137 million were primarily driven by licensing, heater, and catalyst sales in the petrochemical and refining markets" and "Adjusted operating income was positively impacted by strong execution progress, earned fees and process performance."

224.   On February 25, 2019, McDermott held a conference call with analysts (the "2/25/2019 Earnings Call") regarding its Q4 2018 earnings release, on which Defendants Dickson and Spence discussed the financial and operational results for the quarter, which included reported losses in several segments. In response to an analyst's question about the growth outlook for the technology segment, Defendant Dickson stated:

> What I would say today is that *the technology business is in very, very good shape.* I mentioned in my prepared remarks that we're seeing an emerging petrochemical market and a big part of the technology company really is in the petchem space. And as you know *one of the strategic reasons for this combination is to have our EPC part of the business benefit from pull-through from the technology.* And the *technology group has had a very good 2018, 2019 has started off in the same trend, and so we're seeing more and more of this type of work coming. So again, the whole strategic rationale of getting the pull- through is still solid and obviously we see that as a strong part of the company moving forward.*

225.   In McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule A, on March 22, 2019, McDermott stated that the result of the Merger "create[d] a top-tier, technology-led" integrated company and reiterated that its technology portfolio is a focus of its business strategy, stating:

> We also have one of the industry's *most robust technology portfolios* and continue to develop cutting edge technology to achieve our customers' objectives.

80

This approach to sustainability and *focus on technology* helps us create *shared value for our company and stakeholders and supports our overall business strategy*.

226. On March 25, 2019, Defendant Spence spoke at Scotia Howard Weil Energy Conference, and McDermott published a 26-page slide deck in conjunction with this event touting the continued success of the technology segment and that technology would remain a focus for the Company. For example, on the slide titled, "Strategic Review of Business Portfolio: Sale of U.S. Pipe Fabrication and Tank Business," a bullet stated, "*Focus remains on technology pull through with differentiated vertical integration capabilities.*" The presentation also noted, "2018 revenues were driven by NCSA and MENA and *key contributors to operating results were* MENA and *Tech,*" and that "*Tech continues to produce strong and steady results.*" The presentation further reiterated prior statements regarding Lummus Technology, including, "*Longer term, this business segment is expected to house all of the technology that underpins McDermott's business*."

227. On March 26, 2019, Spence met with Kingstown, and, consistent with McDermott's public position, falsely assured Kingstown that McDermott had sufficient liquidity, and that McDermott did not anticipate any distress scenario in which material assets, including the Technology Business, would need to be sold.

228. McDermott filed with the SEC its Form 10-Q for Q1 2019 (the "Q1 2019 10-Q") on April 29, 2019 and was signed and SOX certified by Defendants Dickson and Spence, which disclosed the significant impact the technology segment had on revenues and operating income for the three months ended March 31, 2019 as follows:

> *Technology*—Revenues during the first quarter of 2019 were $148 million (all of which was due to the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and also the sale of catalyst materials.

****

81

*Technology*—Segment operating income during the first quarter of 2019 was $35 million (including $17 million of project-related and other intangible assets and investment in unconsolidated affiliate-related amortization).

229.   On April 29, 2019, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on first quarter 2019 financial and operational results, stating:

> McDermott's operating income for the first quarter of 2019 was $13 million and adjusted operating income was $86 million, excluding the previously described restructuring, integration and transaction costs. ***Operating income for the first quarter of 2019 was favorably impacted by*** the execution of various projects in MENA and NCSA, as well as ***strong performance in the Technology segment***

230.   On April 29, 2019, McDermott held a conference call with analysts (the "4/29/2019 Earnings Call") regarding its Q1 2019 earnings release, on which Defendants Dickson and Spence discussed the Q1 2019 earnings and guidance for the rest of the year and 2020. During the call, Defendant Dickson stated:

> Having completed the integration and now clearly witnessing the combined market power of the two companies, ***we have continued to validate and strengthen the strategic rationale for putting McDermott and CB&I together.***

> As a reminder, that ***rationale*** was built upon three drivers, firstly, ***adding a technology capability that would enable us to tap into a significant pull-through opportunity;*** secondly, diversifying beyond offshore and subsea and more specifically establishing an onshore presence in the growing LNG and petrochemical markets; and thirdly, gaining significant scale to enhance and broaden our competitive position.

231.   On July 29, 2019, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on second quarter 2019 financial and operational results and full year guidance, stating:

> [I]n our ***Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018.*** One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. ***Our Technology business gives us unparalleled insight into upcoming EPC opportunities,*** and we

see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years.

232.    On July 29, 2019, McDermott held a conference call with analysts (the "7/29/2019 Earnings Call") regarding its Q2 2019 earnings release, on which Defendants Dickson and Spence discussed the Q2 2019 financial and operating results. In prepared remarks during the call, Defendant Dickson reiterated statements in the July 29, 2019 press release regarding the success of the Technology Business stating:

> *[I]n our technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. Beyond that, as a result of recent or pending technology license sales, we continue to see roughly $40 billion of potential EPC pull-through opportunities in refining and petrochemical.*

233.    During the 7/29/2019 Earnings Call, Defendant Spence provided the financial results of the technology segment, stating:

> We reported revenues of $154 million and operating income and margin of $35 million and 22.7% respectively, primarily driven by catalyst shipments, execution progress, earned fees and process performance.

234.    In response to an analyst's question during the 7/29/2019 Earnings Call about the structural changes made in the technology segment and the outlook for the technology segment, Defendant Dickson noted that change in leadership in the beginning of the year in the Technology Business would strengthen the segment, stating:

> [T]he changes was we had retirement of the Head of Technology. Dan has agreed to stay on for approximately 12 months as he knew that we'll be busy and the management team is busy fixing some other things and also, got a lot of confidence in the technology business. What we've done since beginning of this year is we have put a new person in charge for that business, Dan has retired. And *we have also challenged the new team to really re-energize the technology business.* And the reason we say that is that, *one has a strong position already in the marketplace. There was feedback from our customers we feel that Lummus has an even stronger position in the marketplace.*
>
> So we are doing a review of the whole business, looking at whole portfolio of the technologies. And the big things that we really are driving though and really taken opportunity to buy, sell license, also takes us into FEED, the sale of critical

equipment and then ultimately, the EPC. So what we've noticed is just in the last three and six months is those number of opportunities have significantly increased.

In addition, what we've done is, although, we operate the technology businesses in the segment, we've also integrated it more with regards to our business development efforts. ***And so when we are sitting across from a customer, we're not just talking about down a license, we were actually talking about how we can support a customer through the various stages of developing the project, so starting to see some positives on that.*** And with S-OIL award, in South Korea was a major award, although, it's only a master license at this stage. But it's an example of a project which can lead to the award of the various next stages and including some high margin activity.

235.    The foregoing misstatements were materially false and misleading. Defendants either concealed or chose to ignore the true costs and risks of the Merger and the Focus Projects and deceived investors, including Plaintiffs, about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects.

### 4.    *The Post-Merger Statements Concerning The Capital Structure/Liquidity Fraud*

236.    Defendants' insistence that the balance sheet of McDermott post-Merger would be stable and have enough working capital to prevent liquidity issues and maintain a sustainable capital structure, while McDermott was heading towards a liquidity crisis due to the immensely under-estimated costs of the Four Focus Projects, constituted fraudulent conduct.

237.    The 3/22/2018 Presentation contained false and misleading statements about McDermott's liquidity and capital structure. McDermott stated, on a slide titled "A Transformational Combination" that the Merger "Provides capital structure with liquidity to fund

growth and manage downside scenarios." A later slide titled "Financing" said that "Sufficient funded debt being raised to strengthen balance sheet and provide liquidity to manage working capital needs, timing and focus projects."

238.   The foregoing misstatements were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors, including Plaintiffs,  into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct.

239.   The Proxy Statement contained the following false and misleading statements:

*After the Combination, McDermott expects to have a strong capital structure* to support growth. The combined business is expected to generate EBITDA growth and strong free cash flow, enabling a reduction in funded indebtedness over the next few years.

240.   The foregoing misstatements in the Proxy Statement were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors, including Plaintiffs,

into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct.

241.   On April 24, 2018, McDermott filed a Form 10-Q with the SEC for the first quarter of 2018 (the "Q1 2018 10-Q"), SOX certified by Defendants Dickson and Spence, which the following statement about liquidity: "We believe our anticipated future operating cash flow, capacity under our credit facilities and uncommitted bilateral lines of credit, along with access to surety bonds, will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our normal, anticipated working capital needs for the foreseeable future."

242.   The foregoing misstatements in the 10-Q were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors, including Plaintiffs, into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence

that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct.

243.   McDermott filed with the SEC its Form 10-Q for Q2 2018 (the "Q2 2018 10-Q") on July 31, 2018, which was SOX certified by Defendants Dickson and Spence, stating:

> We believe our cash on hand, cash generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and other external sources of liquidity, such as the issuance of debt and equity instruments, **will be sufficient to finance our capital expenditures... settle our commitments and contingencies...and address our normal, anticipated working capital needs for the foreseeable future.**

244.   In an earnings call with analysts that same day (the "7/31/2018 Earnings Call"), which Plaintiffs attended regarding its Q2 2018 earnings release, in response to analyst question about McDermott's liquidity and working capital, Defendant Spence falsely stated

> Just on our liquidity targets, they remain unchanged. So, we're still targeting as you mentioned to get below 2 times leverage in 2020. That in part is driven by our CPI program. You see we are accelerating our cost savings. It's about execution in the current portfolio and as you know, it's about booking new orders. We have a significant revenue pipeline that could bring along with it significant advances at the beginning of new projects."

> ****

> [W]e always expected that the combined business would operate on somewhere between $800 million to $900 million of negative working capital. We always expected some volatility quarter-to-quarter and you see that really with Q2. We did get a negative spike, which is good for cash flow, but as expected that is going to unwind in the second half. And that's mainly driven by the outsized advances that we have received earlier on both Cameron and Freeport. So that $900 million negative level by year-end, we see that as a somewhat stable level going into 2019.

245.   On October 30, 2018, McDermott filed with the SEC its Form 10-Q for Q3 2018 (The "Q3 2018 10-Q), SOX certified by Defendants Dickson and Spence. Within this filing, McDermott falsely stated:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit, together with the expected proceeds for the Private Placement, **_will be sufficient to finance our capital expenditures... settle our commitments and contingencies... and address our normal, anticipated working capital needs for the foreseeable future._**

246.   On October 30, 2018 as well, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on third quarter 2018 financial and operational results, stating, in relevant part:

> We have also entered into definitive agreements...providing for the private placement of $300 million of redeemable preferred stock, together with warrants to purchase 3.75% of our common stock, subject to customary closing conditions.
>
> In addition, we have separately received commitments for a $230 million increase in letter of credit capacity, subject to closing conditions. **_Proceeds from the private placement are expected to provide liquidity to fund working capital needs,_** and the increase in letter of credit capacity will enhance the Company's readiness to book anticipated very strong order intake.

247.   McDermott held its earnings call with analysts for Q3 2018 that same day (the "10/30/2018 Earnings Call'). During the call, Defendant Dickson said:

> Now let me summarize the key points I'd like each of you to take away from today's call. Firstly, outside of the legacy Focus Projects, the company reported solid operating performance, strong bookings, and healthy liquidity in a rebounding market.
>
> ****
>
> [W]e have entered into definitive agreements with the investment funds managed by the Merchant Banking Division of Goldman Sachs, providing for the private placement of $300 million of redeemable preferred stock. **_We have also separately received commitments for a $230 million increase in our letter of credit capacity. Proceeds from the private placement are expected to fund working capital needs,_** and the increase in the letter of credit capacity will enhance the company's readiness to book anticipated very strong order intake.

248.    During that same call, Defendant Spence stated, "Our net working capital position is expected to be approximately $1.5 billion at the end of the year. The supplemental steps we have taken to strengthen our balance sheet are not included in the figures I just spoke to." Also during the 10/30/2018 Earnings Call, Defendant Spence was asked an analyst question about McDermott's balance sheet and reasoning behind raising expensive equity and stated:

> [W]e're wanting to provide certainty to our company, our employees and our customers, as we work through the period between now and when we achieve the exit of the tank and the pipe business. And additionally we need the additional capital to support our growing business. So as David mentioned we've got an $80 billion opportunity pipeline, all of our end markets are in growth, and we are looking at an increased order intake pace. ***So it's all about kind of providing some working capital, providing support for our growing business and just ensuring that we've got a very kind of prudent balance sheet to manage through 2019.***

249.    McDermott filed its SEC Form 10-K for the year 2018 on February 25, 2019 (the "2018 10-K). The 2018 10-K was signed, and SOX certified, by Defendants Dickson and Spence. Within the 2018-K, McDermott stated:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit ***will be sufficient to finance our capital expenditures....settle our commitments and contingencies...and address our normal, anticipated working capital needs for the foreseeable future.***

250.    On February 25, 2019, McDermott also held its Q4 2018 Earnings Call with analysts (the "2/25/2019" Earnings Call), and Defendant Spence stated the following in response to an analyst's question pertaining to cash flows:

> [O]n your question about free cash flow, similar to the main comments on our earnings - on our results overall. We expect free cash flow to be negative in the first half, and then turn in the second half. Our business models remain unchanged. So that means in our onshore business we are still getting customer advances and ***we still build up negative working capital and our new awards, and that is fundamentally part of our plan. Overall with our free cash flow being nagged in the first half, we're still very comfortable with our overall cash position.***

251. During that call, Spence also said, "Operating cash flow is similarly expected to be stronger in the second half, as we begin to see reduced outflows on the focus projects. Other assumptions embedded in our guidance include an assumption of no material project charges, sound execution on the project portfolio, and a healthy pace of new orders, as supported by our revenue opportunity pipeline."

252. In their Q1 2019 Form 10-Q filed with the SEC on April 29, 2019 (the "Q1 2019 10-Q"), SOX certified by Defendants Dickson and Spence, McDermott had the following to say about their liquidity situation:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and *proceeds from previously announced non-core asset sales will be sufficient to finance our capital expenditures, settle our commitments and contingencies...and address our normal, anticipated working capital needs for the foreseeable future*

253. In the Earnings Call with analysts also held on April 29, 2019 (the "4/29/2019 Earnings Call"), which Plaintiffs attended, Defendant Dickson stated:

> We are improving organizational efficiency and *have established a capital structure that serves our needs over the intermediate term.* In this regard, I see 2019 as a year of stabilization and transition with 2020 as a year in which we will begin to demonstrate our full potential.

254. During the 4/29/2019 Earnings Call, Defendant Spence, remarking on liquidity said:

> *We are comfortable with the company's liquidity profile over the course of 2019,* supported by the $1.1 billion of cash and revolver availability that we had as of the end of Ql. Again as a reminder, the proceeds from the *anticipated sales of the pipe fabrication and storage tank businesses are not reflected in the guidance.* As far as the cadence of our earnings in 2019, we expect that the second half is likely to be much stronger than the first half, with expected earnings ramping up sharply in the fourth quarter. This is in part due to higher revenues driven by the execution of recently booked backlog, which in turn will drive higher utilization.

255. During the same call, Defendant Dickson said the following about capital structure:

> [W]e expect to have a more attractive backlog profile on a go forward basis. We're doing essentially the same thing today, using a Playbook *to successfully complete*

*the execution of the focus projects, while at the same time steadily building a book of new business at more predictable margins that will provide the foundation for our future earnings and cash flows. We are improving organizational efficiency and have established a capital structure that serves our needs over the intermediate term.*

256.  On July 26, 2019, the SEC served a subpoena on McDermott involving McDermott's public reporting of Cameron's projected losses.  McDermott concealed the existence of the subpoena and the SEC's investigation into McDermott's financial reporting until November 4, 2019, when McDermott disclosed for the first time that the SEC had launched an investigation into its reporting of Cameron's projected losses.[3]

257.  In June 2019, Kingstown urged McDermott's management group to consider exploring potential sale structures of its Lummus Technology Business in order to improve McDermott's liquidity. Unconcerned, Defendant Dickson misleadingly re-emphasized, consistent with McDermott's false public messaging on this issue, that McDermott did not have any liquidity concerns and that the Lummus Technology Business remained a valuable asset, and concealed that McDermott was struggling to pay its vendors.  Kingstown did not learn until after McDermott's bankruptcy that mere weeks after this meeting that McDermott began delaying payments to its vendors and subsequently ceased payment to its vendors.

258.  On July 29, 2019, McDermott filed on SEC Form 10-Q its quarterly report for Q2 2019 (the "Q2 2019 10-Q"), SOX certified by Defendants Dickson and Spence. In the Q2 2019 10-Q, McDermott stated:

---

[3] McDermott may be facing other serious investigations relating to CB&I.  Upon information and belief and based on public reports, a former program director of CB&I may be a  facing Colombian investigation in connection with an alleged fraudulent scheme in which at least two CB&I senior executives conspired with executives of Colombia's state-run oil company in order to commit fraud, ultimately leading to $2 billion in potential losses to a Cartagena oil refinery. Upon information and belief, the matter may be the subject of a potential ongoing Foreign Corrupt Practices Act investigation by the United States Department of Justice.

We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and *proceeds from previously announced non-core asset sales will be sufficient to finance our capital expenditures, settle our commitments and contingencies...and address our normal, anticipated working capital needs for the foreseeable future.*

259.   McDermott held its earnings call with analysts for Q2 2019 the same day (the "7/29/2019 Earnings Call"), which Plaintiff attended, in which Defendant Spence falsely said, "I'd also like to note that we continue to believe that the company's liquidity profile is adequate, and I would remind you that the guidance we are providing today is based on our current portfolio." Later in the call, responding to an analyst question about liquidity, Spence said:

So just as a reminder...our guidance for the full year, does not include *the divestiture of our tank storage business or the remaining pipe fabrication assets.* So, our guidance includes the benefit of those businesses, all the way to the end of the year. We are comfortable with the liquidity at the end of Q2, which is $1 billion. *We are guiding - giving guidance for the back half of the year, and given our credit facilities and bilateral facilities, we are comfortable with the overall liquidity profile of the company. If you look at the asset sales, just in general, our tank business is a global business. It has a high level of interest, it was the foundation entity of CB&I. So it has taken us a little bit longer to prepare it for sale. It's taken a little bit longer for our buyers to understand the global scale and growth opportunities of that business. But we would hope to drive that process to conclusion relatively soon.*

260.   On July 30, 2019, after having falsely represented to investors since on or about October 30, 2018, that McDermott planned to sell its storage tank construction and pipe fabrication businesses for in excess of $1 billion to pay down existing debt, McDermott abandoned this false claim.  Indeed, Defendants Dickson and Spence had made similar misrepresentations to Kingstown on November 5, 2018, assuring Kingstown, consistent with their public statements,  that the sale of its storage tanks would itself be a "significant deleveraging event." However, on July 29, 2019, McDermott instead announced that the sale of the distribution and manufacturing arm of its pipe fabrication business only yielded net proceeds of $83 million, and stated that the anticipated aggregate net cash proceeds of the pipe fabrication and storage tank transactions were "now"

expected to be lower than $1 billion. McDermott released a press release with their 2Q 2019

earnings results that was filed with the SEC as an exhibit on a Form 8-K/A signed by Defendant

Spence, and that had the following statements about asset sales from McDermott Asset Sales:

> During the second quarter of 2019, McDermott completed the sale of the APP business, the distribution and manufacturing arm of its pipe fabrication business. ***McDermott continues to pursue a sale of the remaining portion of its pipe fabrication business.***
>
> ***We have identified potential buyers for our industrial storage tank business, and sales efforts with respect to that business remain ongoing.*** In connection with that contemplated sale, we may retain a continuing minority ownership or other economic interest in the business. Our anticipated aggregate net cash proceeds from the pipe fabrication and storage tank transactions are now expected to be lower than the approximately $1 billion we previously estimated. Our ongoing competitive sale process is now expected to result in a closing of the sale of the storage tank business in the fourth quarter of 2019.

261.    The press release also had the following statements from Defendant Dickson:

> "This is a year of transition as we position McDermott to fully optimize the benefits of our combination with CB&I and as we steadily advance toward completion of the Cameron and Freeport projects," added Dickson. "Nevertheless, the company today has updated its guidance for 2019. The reduction in our guidance is due to four main factors: 1) the weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA operating segment; and 4) a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives on the Cameron LNG project. Even so, ***we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020.***

262.    Further, in a meeting between Kingstown and McDermott on or about July 31, 2019,

McDermott updated Kingstown on the status of its asset sales, and represented, consistent with its

public disclosures, that its tanks and pipe businesses were generating approximately $1 billion in

revenue, and 100 million of EBIDTA and that "both of these businesses were undermanaged" and

have earnings power significantly down from their peak.

263.    However, months later, on October 21, 2019 McDermott announced a new financing agreement and noted that the company "has decided to terminate its previously announced sale process for its industrial storage tank business," despite the fact that McDermott had touted the potential sale of its tank and pipe businesses as an important de-risking event for the company.

264.    The company revealed in October 2019 that the EBIDTA profiles for the tank and pipe businesses was only approximately $100 million (compared to prior November 2018 forecasts that set the tank business at $140 to $150 million of EBIDTA and the pipes business at $40 million).

265.    News that McDermott would not be selling the tank business and pipe business surprised investors, including Plaintiffs, based on consistent prior representations that "the sale process for each . . . business[] is going well and as planned."

266.    Further, Defendants failed to disclose the pending SEC investigation in McDermott's financial reporting, which ultimately led Spence to resign on or about November 5, 2019.

267.    The foregoing misstatements were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Falsely touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors, including Plaintiffs,  into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund

ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis post-Merger due to the immensely underestimated costs and rising cash burn of the Four Focus Projects about which Defendants had been aware, constituted fraudulent conduct.

### 5. *Partial Corrective Disclosures Incrementally Revealed The Frauds*

268. Interspersed with the foregoing misstatements were a series of partial corrective disclosures that incrementally revealed aspects of the three threads of Defendants' fraud and wiped out most of the company's share value.

269. On October 30, 2018, McDermott reported its Q3 2018 results in an after-hours press release (the "10/30/2018 Press Release"), which was filed with the SEC after the market close as an exhibit to a Form 8-K (the "10/30/2018 Form 8-K") signed by Defendant Spence. The 10/30/2018 Press Release revealed the following previously undisclosed facts to investors.

270. The 10/30/2018 Press Release revealed significant "purchase accounting adjustments" related to CB&I acquisition (referred to as the 'Combination'), which "were reflected as a change in intangible assets, including goodwill." Specifically, it disclosed that, "[f]or the third quarter of 2018, McDermott recorded *$744 million* of changes in estimates on three projects, including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project, and $68 million on the Calpine gas power project." It quoted Defendant Dickson as stating:

> *After five months of ownership, we now believe* we have a thorough and definitive understanding of the schedule and cost position on each of the projects - and clear visibility into the operational and financial path to completion. We have taken *significant steps* to address performance issues on the three projects. Specifically, we have installed a *new executive leadership team -* including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination and made *improvements in the reporting structures, execution plans, forecast cost-base methodology and the flow of communication* with our consortium members and customers. *We expect no further material changes in the cost estimates on these projects.*

271.    The 10/30/2018 Press Release revealed to investors previously undisclosed details as to the extensive, costly problems that had been plaguing the Cameron LNG Project, leading to **$482 million** in changed estimates, stating:

> Cameron LNG Project - *the changes in estimates followed a detailed reassessment of the schedule and cost base*. The analysis included a comprehensive review of the work to go, *including work for which we may not be compensated - such as rework -* and *a reduction in productivity estimates.* The reassessed schedule and estimates reflect *regional limitations on labor availability and quality,* the *elimination of an incentive opportunity* and the *addition of liquidated damages* associated with the completion schedule. Operationally, the project continues to progress well, with commencement of commissioning expected in the fourth quarter and first LNG expected in the first quarter of 2019. As of the end of the third quarter of 2018, the project was 83% complete and had approximately $557 million of McDermott's portion of expected revenues to go until expected completion. During the quarter, the Cameron LNG project contributed $191 million to revenues and ($34) million to cash flows from operations. Phase 1 of the Cameron project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.

272.    Significantly, unbeknownst to investors, including Plaintiffs, the $482 million on Cameron, when added to the $165 million in changed estimates previously taken on the project in Q2 2018, meant that McDermott had belatedly recognized **$647 million** total - very near to the $700 million in necessary minimum charges that had been, noisily, internally documented to senior management back in June 2018.

273.    The 10/30/2018 Press Release also revealed undisclosed details of the problems afflicting the Freeport LNG Project, leading to **$194 million** in changed estimates, stating:

> Freeport LNG Project - *the changes in estimates followed a detailed reassessment of the schedule and cost base and a reduction in forecasted labor productivity resulting from regional limitations on labor availability and quality.* The change in estimates was also impacted by the Company's decision, reached in conjunction with ongoing customer discussions, *to include liquidated* damages associated with the pre-Hurricane Harvey schedule. The updated forecast is based on rigorous reassessments and views by project teams and site management, including the area supervisor's assessment of work to go. At the end of the third quarter of 2018, the project was approximately 82% complete and had approximately $622 million of McDermott's portion of expected revenues to go until completion. During the quarter, the Freeport LNG project contributed $220 million to revenues and ($115)

million to cash flows from operations. Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.

274.    The 10/30/2018 Press Release also revealed undisclosed details as to the issues affecting the Calpine Gas Turbine Project, leading to *$68 million* in changed estimates, stating:

> Calpine Gas Turbine Power Project - *the changes in estimates resulted from our decision to decrease the productivity factor on the future work by 20%. The major driver of increased costs on Calpine has been labor productivity involving both direct-hire and sub-contract employees*. The newly assumed productivity factor also considered lessons learned on the closeout experience on the recently completed IPL project and we believe is realistic and achievable. First fire is anticipated during the fourth quarter of 2018. During the quarter, the Calpine Gas Turbine Power project contributed $29 million to revenues and ($14) million to cash flows from operations. As of the end of the third quarter of 2018, the project was 91% complete and had approximately $27 million of expected revenues to go until expected completion in Q1 2019.

275.    Finally, the 10/30/2018 Press Release also revealed that McDermott had *already decided to exit* both the tank storage and the U.S. pipe fabrication businesses, stating:

> [W]e have completed a strategic review of our business portfolio and have determined that the tank storage business and the U.S. pipe fabrication business are not core to our vertical integration. As such, we have developed plans to seek buyers for each of the two businesses, which together had 2017 revenues of approximately $1.5 billion. We anticipate receiving proceeds in excess of $1 billion upon the sale of those assets and expect to use a majority of the proceeds to reduce debt under our term loan.

276.    The same day, McDermott filed with the SEC its Form 10-Q for Q3 2018 (the "Q3 2018 10-Q"), which disclosed additional previously undisclosed facts to investors, as follows:

> *Significant changes in our preliminary purchase price allocations* since our initial estimates reported in the second quarter of 2018 primarily *related to fair value adjustments to three of our acquired loss contracts. Adjustments to the Cameron LNG, Freeport LNG and Calpine projects were approximately $744 million combined and primarily impacted Advance billings on contracts* as further discussed in Note 4, Revenue Recognition. *As a result* of these and other adjustments to the initial purchase price allocation, *goodwill increased by approximately $782 million since the second quarter of 2018. Adjustments to the purchase price allocation are recognized in the period in which the adjustments are determined and calculated as if the accounting had been completed as of the Combination Date.*

277.   The Q3 2018 10-Q further quantified the impacts project by project:

Based on our assessment at September 30, 2018, *included in the preliminary purchase price allocation for the Combination* (see Note 3, Business Combination) *were four projects determined to be in substantial loss positions,* which included the *Cameron LNG, Freeport LNG Trains 1 & 2, Calpine* and the now-completed IPL gas power projects. Based on our assessment at June 30, 2018, our *Freeport LNG Trains 1 & 2* project was not estimated to be in a loss position; however, *as a result of changes in estimates during the third quarter of 2018, the project is now estimated to be in a loss position at completion*. Our Freeport LNG Train 3 project is not anticipated to be in a loss position. *Changes since our initial preliminary assessments during the second quarter of 2018 reflect unfavorable changes in estimates of $482 million on the Cameron LNG project, $194 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $68 million on the Calpine project.* These changes in estimates did not have a significant direct impact on our net income for the three or nine months ended September 30, 2018, as the *impact of the changes in estimates were included as adjustments to the fair values reflected in the acquired balance sheet.*

*Our accrual of provisions for estimated losses on active uncompleted contracts at September 30, 2018 was $215 million and primarily related to the Cameron LNG, Freeport LNG Trains 1 & 2 and Calpine loss projects.* Our accrual of provisions for estimated losses on active uncompleted contracts at December 31, 2017 was not material.

278.   Discussing the Cameron LNG project, the Q3 2018 10-Q blamed a purported

"reassessment" of schedule and underlying cost, related to conditions at the time of the Merger:

*Cameron LNG*—At September 30, 2018, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 37% complete on a post-Combination basis (approximately 83% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $127 million.

*The increase in our cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily due to changes in estimates resulting from a detailed reassessment of schedule and underlying cost base. The schedule analysis included a reassessment of the work to go, including re-work for which we may not be fully compensated, and took into account revisions to the estimation of productivity based on historical efforts and the quality and availability of labor resources throughout the revised project schedule.* The revised schedule also results in loss of incentive revenue (approximately $40 million) and the application of contractual liquidated damages (approximately $17 million). These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the

acquired balance sheet, as *they resulted from refinements of estimates of conditions that existed as of the Combination Date, and primarily impacted Advance billings on contracts.*

279.    The Q3 2018 10-Q contained similar revelations about the Freeport LNG project:

*Freeport LNG*—At September 30, 2018, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 43% complete on a post-Combination basis (approximately 86% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $28 million.

*The increase in the cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily due to changes in estimates resulting from a detailed reassessment of schedule and underlying cost base. The schedule analysis included a reassessment of the work to go, including re-work for which we may not be fully compensated, and took into account revisions to the estimation of productivity based on historical efforts and the quality and availability of labor resources throughout the revised project schedule.* Our changes in estimates for the project also reflect our decision, reached in conjunction with ongoing customer discussions, to include liquidated damages (approximately $53 million) associated with the pre-Hurricane Harvey schedule. These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, as *they resulted from refinements of estimates of conditions that existed as of the Combination Date, and primarily impacted Advance billings on contracts.*

280.    The Q3 2018 10-Q similarly discussed the Freeport LNG project:

*Calpine Power Project*—At September 30, 2018, our U.S. gas turbine power project in the Northeast for Calpine (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 53% complete on a post-Combination basis (approximately 91% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $43 million. *The increase in the cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily associated with revisions to the estimation of productivity based on historical performance.* These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, *as they resulted from refinements of estimates of conditions that existed as of the Combination Date,* and primarily impacted Advance billings on contracts.

281.    In describing McDermott's operating results, the Q3 2018 10-Q also stated, "The

legacy CB&I operations included approximately $2.4 billion of negative working capital at the

Combination Date, including approximately $1.2 billion of negative Project Working Capital associated with our Calpine power project and our proportionate shares of the Cameron LNG and Freeport LNG consortium projects (our "Focus Projects"). Negative Project Working Capital for the Focus Projects was approximately negative $760 million at September 30, 2018." After describing components of working capital that had provided cash during the quarter, the Q3 2018 10-Q stated that they were offset by "Contracts in progress/Advance billings on contracts—a net increase of $318 million, primarily due to the impact of progress on projects within our NCSA segment (including approximately $585 million from our Focus Projects), partially offset by projects within our MENA and APAC segments."

282.    By characterizing the $744 million in charges related to the Four Focus Projects as a change in estimate as of the Merger Date, rather than a current third quarter change, Defendants acknowledged that the facts warranting the charges existed at the time of the Merger.

283.    Following these disclosures, an analyst from UBS wrote in a report that the "additional cost overruns are surprisingly large, and we presume that MDR will now have a different business than what it envisioned when it agreed to acquire CB&I." Jamie Cook, the Credit Suisse analyst following McDermott, stated in an October 30, 2018 research report that "the magnitude" of the charges on the three projects "was larger and will create additional uncertainty on management's handle on the risk associated with the CBI deal. . . . We believe that quarter will drive more questions and uncertainty. As such, we believe the stock is in the penalty box until MDR can provide confidence to the market that the problem projects are under control." He soon thereafter lowered his price target on McDermott's stock by over 56%. According to a Deutsche Bank analyst report on October 31, 2018, "[while the market was expecting a capital raise, a second consecutive round of charges was not priced in." The report indicated that the value of

McDermott's stock took a hit due to those unexpected charges, because the risk of additional charges is now higher due to management credibility taking a hit, because McDermott's ability to sell the pipes/tanks business at a fair price was low given their need to sell quickly, and due to the fact that McDermott's ability to win new business contracts was lowered because the problems with existing projects would scare off customers.

284.   On this news, McDermott's stock price fell $5.14, a **40% single-day decline,** on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.

285.   On February 13, 2019, McDermott issued a press release (the "2/13/2019 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K (the "2/13/2019 Form 8- K") signed by Defendant Spence, "commenting on its assessment of the financial position of the Cameron LNG project as of December 31, 2018." The 2/13/2019 Press Release contradicted the 10/30/2018 Press Release's statement, as regards the Cameron LNG Project, that "We expect no further material changes in the cost estimates on these projects." Specifically, the 2/13/2019 Press Release stated, "For the fourth quarter of 2018, McDermott expects to report ***an adverse change in estimate of approximately $168 million, due to unfavorable labor productivity, and increases in subcontract, commissioning and construction management costs.*** " It added, "***The change in estimate is expected to impact McDermott's statements of operations for the three months and year ended December 31, 2018.*** "

286.   A February 13, 2019 analyst report from Credit Suisse mentions the Cameron LNG adverse change of $168 million for Q4 2018 as "disappointing given the magnitude of the charge in the third quarter," showing the market's reaction to continual adverse changes in cost estimates on the project.

287.   On this news, which caught analysts off-guard, McDermott's stock price fell $2.48, a **26.7% single-day decline,** on extremely high volume, from its February 12, 2019 closing price of $9.30 to close at $6.82 on February 13, 2019.

288.   On July 29, 2019, McDermott issued an after-hours press release (the "7/29/2019 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K (the "7/29/2019 Form 8-K") signed by Defendant Spence, disclosing additional negative impacts from the CB&I projects at issue and adverse new information regarding McDermott's exit from the industrial storage tank and pipe fabrication businesses, as follows:

> Cash used by operating activities in the second quarter of 2019 was $(205) million. This primarily reflected the company's net loss and the usage of cash on the Cameron LNG project." This contributed to a reported net loss of $146 million, or $0.80 per diluted shares, and an operating loss of $61 million in the second quarter of 2019.

289.   Defendant Dickson noted that the "legacy CB&I projects," which were not "booked under McDermott's stringent risk management protocols," still represented 14% of McDermott's then-current backlog. Dickson added:

> [T]he company today has updated its guidance for 2019. The reduction in our guidance is due to four main factors: 1) weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) **changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA** [North, Central and South America] **operating segment**, and 4) **a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives in the Cameron LNG project.**

290.   Further, the 7/29/2019 Press Release disclosed that the 10/30/2018 Press Release's articulation of the purported upside of McDermott's exiting the industrial storage tank and pipe fabrication businesses was overstated. Specifically, the 7/29/2019 Press Release disclosed: "Our anticipated aggregate net cash proceeds from the pipe fabrication and storage tank transactions are now expected to be lower than the approximately $1 billion we previously estimated."

291.   During the earnings call that morning, these topics were further discussed, with Defendants reiterating the foregoing points and providing additional details to analysts. During Q&A, the following exchange concerned the Cameron and Freeport projects:

> [Analyst]:      ... [A]s you guys know, it's been over a year since B&I closed. So in general, when do you think that investors could get comfortable that the vast majority of your backlog at risk will get better? And I know you mentioned that CB&I and NCSA backlog would be under $1 billion by the end of this year and $20[0] million by the end of '20. But what's the risk that we have to wait until the end of2020 for you to reduce the noise in the backlog?

> [Dickson]:      *If you look at also the majority of this backlog still relates to Cameron and Freeport.* And as you can see in the supplemental deck, the completion dates for those projects haven't changed since Ql. So once we have those two, obviously, those two projects ongoing and we'll obviously continue to - *- these are zero margin revenue projects*. But the balance of the portfolio, I would say today that and I said in prepared remarks is obviously of our confidence level is growing as we've gone through with each and every one of them.

> And as you're seeing once we get through to the back end of 2020, we're essentially through that, we only $200 million of the backlog left. So I think that after 12 months — and obviously, *a lot of our focus* as you know *has been on Cameron and Freeport, because of the quantum — the charges we'll have to take on both of those projects.* And what we'd say today is, obviously, we've made a lot of good progress. The incentive discussion with the customer — the customer has been very fair with us. But unfortunately, a large part of those incentives won't be realized until 2020. But generally over the portfolio, I think we're as times progress, we're getting our arms around it more and more. But *I think the two big remaining initiatives will always be Cameron and Freeport until we've got them completely done.*

292.   Analysts once again expressed disappointment. On July 30, 2019, Deutsche Bank issued a research report titled "One Step Forward, Three Steps Back," rating an investment in McDermott a "Hold." In the report, Deutsche Bank noted the following:

> Our Thoughts

> MDR's 2Q results fell short of expectations. Not only did core numbers miss street estimates, but the company took charges on 2 projects (Freeport and Pemex) and cut guidance due to project delays (Marjan and Mozambique LNG got booked later than expected). *It also lowered performance expectations on legacy CB&I projects and recalibrated its asset sale proceeds outlook downward* .... We lower our EPS estimates and cut our PT to $7 due to revenue slippage on several projects,

changes in assumptions regarding legacy CB&I projects in the NCSA segment, and a shift in timing of Cameron incentives from 4Q19 to 2020.

* * *

Key Takeaways

Updated 2019 guidance - lowered revenue to $9.5B (vs. $10.0B previously), adj EBITDA revised to S725M (vs. $1.1B previously), and adj EPS-S0.32 (vs. $1.65 previously); 2) cut FCF guidance to -$640M (vs. -470M previously) and raised gross debt to $3.8B from $3.7B. . . . $110M of progress incentives recognized for Cameron LNG project ($75M in cash expected to be received in 2H19 of which $38M was received in July and $35M expected to be received in 2020), $38M project change for Freeport LNG....

293.   A Credit Suisse report from the same day states that McDermott "results were weighed down by" by charges across multiple projects, and that the Company cut its FY 2019 EBIDTA by around 50%, partly due to a "pushout on timing of incentives from Q4'2019 to 2020 on Cameron LNG."

294.   On this news, which again surprised analysts, McDermott's stock price fell $3.56, another huge ***35.3% single-day decline,*** on very high volume, from its July 29, 2019 closing price of $10.08 to close at $6.52 on July 30, 2019.

295.   On September 18, 2019, McDermott's stock price plummeted 49% in morning trading, on volume nearing 18 million shares (compared to its full-day average of 7.5 million shares), amid leaks and rumors that it had hired a turnaround firm, according to ***Briefing.com.*** ***MarketWatch*** reported that McDermott was the NYSE's "leading loser" and "headed for the biggest one-day decline since the company went public in 1982 prior to the trading halt for news." Trading was halted for several hours, followed by multiple attempts to restart trading that had to be aborted due to volatility. In a section covering companies under "Pro Bankruptcy Distress," *The Wall Street Journal* published an article reporting that McDermott "has engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate

of net losses." AlixPartners is one of the global leaders in turnaround and restructuring services. Thereafter, speaking publicly for the first time that day, McDermott issued a cryptic statement that failed to deny an impending bankruptcy filing and effectively confirming its hiring of a turnaround firm, stating that McDermott "routinely hires external advisors to evaluate opportunities for the Company. The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

296.   On this news, which prompted numerous interim halts of trading, McDermott's stock price fell $3.72, an unprecedented 63.3% single-day decline, on volume of 77.95 million shares (10x the prior day's volume), from its September 17, 2019 closing price of $5.88 to close at $2.16 on September 18, 2019.

297.   Due to the multiple trading halts imposed during that day, the stock had not yet bottomed out. According to a Citi analyst report from after-hours on September 18, 2019, McDermott needed cash fast to counteract its negative working capital issues, and its Lummus Technology Business was among the assets that could get it that cash, even if that meant the price "in an urgent sale situation could be under pressure." Citi analysts went on to say that prior to the Merger, CB&I had received "significant interest for its Technology asset." Declines continued, both in after-market trading that day and pre-market trading the next day.

298.   On September 19, 2019, McDermott's stock fell another *22.7%,* on even higher volume of 81.35 million shares, to close at $1.67. The two-day decline of $4.21 represented a wipeout of 71.6% of McDermott's stock price. These declines were fueled by the balance sheet issues, and likely need to sell off assets such as Lummus Technology to resolve these issues, at potentially below-market prices, as indicated by Citi. A September 20, 2019 analyst report from

Credit Suisse noted that 'This technology business was known as the crown jewel of the company and considered a last resort...but unfortunately needed [to be sold] to improve the balance sheet."

299.   A UBS analyst report from September 23, 2019 stated that McDermott confirmed multiple bidders were involved in the Lummus Technology sale process. Shortly thereafter, on September 24, 2019, reports came out indicating McDermott was seeking a bridge loan to the tune of around $1.7 billion. This news revealed to the market that the sale process would not finish soon enough to resolve McDermott's short-term woes. *Bloomberg* reported that the bridge loan was to cover McDermott's working capital deficit "until it can sell an asset such as its Lummus Technology unit...." This, according to reporting from *Bloomberg*, indicated that asset sales could not be consummated quickly enough to resolve the balance sheet issues, and the bridge loan was necessary as an emergency measure. Upon this news of continued balance sheet turmoil, McDermott stock fell $0.20 on September 24, 2019 to a closing price of $2.15, an 8.5% drop from its September 23, 2019 close of $2.35.

300.   A few days later, on September 27, 2019, analysis came out detailing McDermott's credit situation as it pertained to obtaining a bridge loan. McDermott, according to an Xtract Research report, would find it "virtually impossible" to obtain super-senior debt that had seniority status over existing creditors under their May 2018 credit agreement. According to the report, existing creditors were unlikely to accept amendments to existing debt rules that moved them back in the priority line. Given McDermott's dire cash flow situation, and inability to unload major assets quickly, the bridge loan was a necessity to keep operations afloat, and these emerging difficulties made a tough situation worse. As these difficulties emerged, McDermott stock fell $0.20 on September 27, 2019 to a closing price of $2.00 a 9.1% drop from its previous day close of $2.20.

301.   On the whole, McDermott's shareholders, including Plaintiffs have been devastated. Since the day McDermott announced its proposed Merger with CB&I, December 18, 2017, when its stock closed at $22.77, its share price has declined $21.07, an evisceration of 92.5% of its market capitalization.

302.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of McDermott's securities, Plaintiffs have suffered significant losses and damages.

**F.    Additional Facts Probative Of Scienter**

**1.    *Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter***

303.   Despite repeatedly touting the claimed due diligence Defendants had done on CB&I, diligence that purported to focus on the Cameron LNG Project, the Freeport LNG Project, and the Calpine Gas Turbine Power Project, McDermott either failed to learn, or consciously disregarded—and then misleadingly reported—a host of red flags connected to the Focus Projects.

*a.*    **McDermott's Claimed Pre-Announcement Due Diligence**

304.   During the 12/18/2017 Investor Call, held the day the proposed Merger was announced, Defendant Spence told analysts, in prepared remarks, which falsely overstated the extent of due diligence McDermott performed in order proceed with the Merger:

> Over the course of this process we have dedicated a significant amount of time performing joint due diligence together with CB&I's team. We've gotten to know one another's operations very well. In particular, ***McDermott has performed a great deal of due diligence on CB&I's*** IPL Eagle Valley, ***Calpine, Freeport, and Cameron projects.***
>
> ***We feel confident that we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects.***

305.   The first question posed by an analyst during Q&A on the 12/18/2017 Investor Call asked about the due diligence done. In response, Defendant Dickson stated, in relevant part, "I'll

tell you that we have worked extensively with CB&I on due diligence, and obviously had a number of our team working with passing through what Stuart referred to as core projects." Defendant Spence added, "[W]e have done a significant amount of diligence around not only the four projects, but the overall portfolio." Later, Defendant Dickson, when expressly asked by an analyst about labor and productivity issues at the Cameron LNG Project and the Freeport LNG Project, stated, *inter alia,* "[W]e've had a large number of people from our side working very closely with [CB&I CEO] Pat [Mullen] and his team through the due diligence process, including looking at the productivity on each of the projects at the sites" and "a lot of good work has been done and I would emphasize that a lot of good transparency from Pat and his team as we have gone through this process." Defendant Spence added, in response to follow up questions, "[L]ike David said on the project side, we've done extensive due diligence. We really understand the balance sheet in the position of the contracts, and we wouldn't add any further color at this time."

306.   Based on this "extensive" due diligence, completed in *less than three months*, the 1/8/2018 Presentation stated: "***Due diligence supports underlying strength and profitability of CB&I.***" As regards the Four Focus Projects specifically, it stated, "***We have performed <u>thorough due diligence</u> and believe we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects going forward.***"

> b.   **McDermott's Post-Announcement Misstatements Regarding Due Diligence**

307.   However, after the Board formally approved the Merger, McDermott released a number of public statements throughout 2018 and 2019 which falsely amplified the extent to which McDermott had performed its diligence efforts before agreeing to approve the Merger.

308.    Despite the length of the three-month period during which McDermott, purportedly, performed due diligence, the Board approved the deal over the dissenting vote of one board member, who specifically reflected, "have we done enough due diligence?" after the deal closed.

309.    Indeed, McDermott itself admitted after the deal closed that this three-month period was "very short" and that McDermott performed "shorter than ideal due diligence"

310.    Nonetheless, when Plaintiffs met with Spence shortly after the closing of the Merger, on or about June 18, 2018, Spence falsely represented to Plaintiffs that he was personally "very, very involved with diligence" and that he had been "living and breathing this deal since last summer."  Spence further represented that he had taken McDermott's internal head of project management control and several "handpicked" people and had this group pour through all of McDermott's data on the CB&I projects and had reviewed with CB&I's head of  "project execution" CB&I's portfolio in depth.  Spence further falsely represented that, while he had done only a "couple of site visits", he "got to a position where we understood their portfolio and backlog well," stating that "you can get 80% backlog coverage if you look at just 14 projects: the focus 4 and 10 others.  Spence also falsely told Plaintiffs that "our view was that as a portfolio, risk was normal for onshore jobs and tracking to the numbers the company contemplated when bidding" and that "the overall portfolio was doing quite well with no significant outsized risks in the other 10 projects." Spence told Plaintiffs that post-announcement of the proposed Merger, "visits were a little top-down, but talking to the project directors allowed us to get another layer down."  He claimed that "we saw nothing new in this phase that we did not see in our earlier diligence."  Post-closing, Spence maintained, at this meeting on or about June 18, 2018, that there had not been "any incremental swing in the projects" and that "nothing incrementally [had occurred] plus or minus." As with its false disclosures to other investors, Spence's statements to Plaintiffs were false and

misleading, failing to disclose the failures in McDermott's due diligence. Spence assured Plaintiffs that he and Defendant Dickson, in fact, were going to spend significant time later that day "review[ing] all four of the Focus Projects."

<em>c.</em>    <strong>Additional Red Flags Around The Time Of The Merger</strong>

311.  On May 24, 2018, a motion by CB&I and certain of its executives to dismiss a securities class action complaint against them was denied in full. *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018). This lawsuit, filed in early 2017, alleges that, between October 2013 and June 2015, CB&I had failed to fully apprise investors regarding delays and loss of profitability of other large-scale projects and instead: (a) recorded unapproved change orders as assets and revenues, in violation of GAAP, in financial statements in Forms 10-K and 10-Q filed with the SEC; (b) overstated goodwill in financial statements in Forms 10-K and 10-Q resulting in part from CB&I's improper recording of purchase price adjustments following a 2013 corporate acquisition, thereby overstating those assets on CB&I's balance sheet and understating expenses on its income statement; and (c) made materially false and misleading statements regarding the progress of those projects and falsely stated that construction delays would have no effect on CB&I's profitability.

312.  Given the similarity of underlying misconduct, this decision put Defendants on renewed notice as to red flags in CB&I's business and operations that gave rise to an additional duty to investigate the Four Focus Projects, a duty to speak the truth about them, and a duty to correct their prior false and misleading statements about them.

> d.  **With Defendants Dickson And Spence At The Helm, McDermott Knowingly Continued Improprieties After The Merger**

313.   With Defendants Dickson and Spence at the helm, McDermott knowingly continued improprieties after the Merger.   Indeed, Defendants Dickson and Spence were motivated by compensation increases tied to the Merger.

314.   Defendants Dickson and Spence had significant personal financial motivations, unique to them, to short circuit due diligence regarding CB&I and mislead investors as to the nature and extent of McDermott's due diligence, to proceed with the Merger and conceal what they discovered and McDermott's liquidity problems after the Merger, and to engage in the securities fraud alleged herein.

315.   Defendants Dickson and Spence were motivated by their increased compensation packages to close the Merger, despite the truncated period of McDermott's due diligence, and to commit the securities fraud alleged herein. First, as disclosed in a Form 8-K filed with the SEC on March 7, 2018, Defendants Dickson and Spence were awarded on March 1, 2018, by McDermott's Compensation Committee, "Recognition Bonuses" attributable to their work on the Merger. Defendant Dickson was awarded a Recognition Bonus of $1,125,000, and Defendant Spence was awarded a Recognition Bonus of $637,500. One-half of each Recognition Bonus was paid in March 2018, immediately upon the award—during McDermott's post-announcement/pre-Merger due diligence—and the other half of the Recognition Bonus was deferred until May 2020, the first-year anniversary of the Merger, based on certain performance criteria.

316.   Moreover, although fiscal 2018 was a bad year for McDermott and legacy CB&I shareholders, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger and post-Merger time periods to immunize Defendants Dickson and Spence from the impact of charges taken post-Merger on the Focus Projects.   Although the Merger closed on the tenth day of the fifth

month of 2018, they were paid 50% (rather than one-third) of their full year 2018 incentive compensation for their four plus months' work. Thus, for 2018, Defendant Dickson was paid—primarily for his four plus months' work prior to the Merger—total executive compensation of $11,294,007, and Defendant Spence was paid total executive compensation of $7,530,641.

317.    Further, according to the Proxy Statement, because the Merger elevated McDermott into a different peer group of companies, Defendants Dickson and Spence received increases in their base and incentive compensation. For example, Defendant Dickson received a 25% increase in his 2018 annual base salary of $1,125,000.

### 2.    *McDermott Raised Funds During The Fraud Period*

318.    McDermott announced its intention to raise hundreds of millions of dollars in funds while its stock was trading at prices elevated by the fraud alleged herein. In an October 30, 2018 Form 8-K and press release, and an October 31, 2018 Form 8-K filed with the SEC, McDermott announced that it entered into a Securities Purchase Agreement to issue and sell in a Private Placement, 300,000 shares of 12% Redeemable Preferred Stock, par value $1.00 per share, and a number of Series A warrants equal to the product of 3.75% times the total number of shares of its common stock, par value $1.00 per share, outstanding as of the closing date, with an initial exercise price of $0.01, for a total purchase price of $289.5 million. Also, in the same press release and Forms 8-K, McDermott announced a Letter of Credit Facility for extensions of credit in the form of performance letters of credit in the aggregate face amount of up to $230 million. On November 29, 2018, in a press release and Form 8-K, McDermott announced the closing of this $289.5 million Private Placement offering, and the availability of the $230 million Letter of Credit Facility. These transactions, which took place during the fraud alleged herein, are evidence of McDermott's corporate scienter.

### 3. *The Fraud Implicated Core Operations*

319.   The fraud alleged herein implicates the core operations of McDermott. The Merger with CB&I was McDermott's largest and most important strategic transaction, both in size and timing, and, upon its closing, the CB&I's backlog represented a massive 74.5% of McDermott's post-Merger multi-billion-do liar backlog.

320.   As regards to timing, when the Merger was announced, McDermott had been a potential takeover target by its rivals. Indeed, on April 23, 2018, Subsea 7, a competitor of McDermott, confirmed that it had earlier made an unsolicited offer to acquire McDermott for $7.00 per share (pre-split) in cash or up to 50% in Subsea 7 stock and the balance in cash. This represented a premium of 16% to McDermott's common stock closing price on April 20, 2018 at $6.05 per share. The value of Subsea's offer was approximately $2 billion. The Subsea 7 offer was not subject to any financing conditions or Subsea 7 shareholder approval. The Subsea 7 shareholder offer, however, was subject to McDermott ending its proposed Merger with CB&I. Subsea 7's offer said it would also consider increasing its proposed price upon further assessment of McDermott's business through discussions with McDermott management.

321.   However, McDermott's Board of Directors, with Dickson's strong endorsement to spurn the Subsea 7 offer, rejected Subsea 7's proposal, as confirmed in a McDermott press release on April 23, 2018, which stated, "We remain fully committed to completing the transformational transaction [with CB&I] and our Board has reaffirmed its recommendation that our stockholders should support it." For his part, Dickson opposed the Subsea 7 offer to entrench himself as CEO and avoid his likely termination if the Subsea 7 offer, which was in McDermott's best interest, was accepted.

322.   Once the rejected bid was public, press coverage on April 25, 2018, indicated that Subsea 7 was willing to offer more. A *Business Guide* article quoted Jean Cahuzac, Subsea 7's

CEO, as stating: "Given the attributes of the proposed transaction and our stated ability to further enhance our proposed terms, we encourage the McDermott board of directors to reconsider this compelling opportunity to combine two complementary businesses." He added: "Our proposal provides equity upside in a company with a robust financial position, as well as a meaningful premium. We see significant merit in such a transaction for all shareholders, and with our financial and legal advisors continue to be open to discussions." A Law360 article reported that Subsea 7 had said it would be open to adjusting its $2 billion bid for McDermott, but that a new offer was possible "only if the Houston-based firm agrees to come to the negotiating table." It quoted Cahuzac as saying, "We would welcome the opportunity to engage with McDermott's board of directors and management to discuss our proposal and the substantial upside opportunity represented by ongoing participation in the equity, with a view to a combination that would be in the best interests of our respective shareholders."

323.    At this time, analysts also stated their optimism that Subsea 7's original bid was just a first offer and that even if Subsea 7 increased its bid, the deal would still be accretive. For example, UBS published an analyst report on April 24, 2018, noting, *inter alia,* that Subsea 7 could still have a value accretive deal at an increased bid of $4/share more. Similarly, Arctic Securities published and analyst report on April 25, 2018 estimating that a bid of just about $2/share more would still result in an accretive deal and that the original $7/share bid was just a first move to initiate a dialog.

324.    Notwithstanding Subsea 7's invitation for further discussions and its willingness to increase its offer, McDermott never engaged Subsea 7 in any negotiations regarding a potential deal choosing, instead, to continue with the proposed Merger with CB&I. On May 2, 2018, in light

of McDermott's opposition to its proposal and the shareholder vote approving the Merger, Subsea 7 withdrew its $7.00 (pre-split) offer.

325.    Indeed, the Merger was McDermott's largest M&A transaction in a decade, if not its entire history, and would augment McDermott's own $3.9 billion backlog with CB&I's $11.4 billion backlog (as of December 31, 2017).

326.    The Merger also represented a massive expenditure of corporate resources, at the cost of turning down the higher premium offered by Subsea 7.

327.    Immediately prior to the Merger on May 10, 2018, McDermott shares split one-for-three. Thus, for example, a holder of 300 McDermott pre-split shares with a closing market price of $6.64 per share on May 9, 2018, exchanged those shares for 100 shares of McDermott common stock (post-split), which closed on May 10, 2018 at $20.70 per share. The Subsea 7 initial offer post-split would have been worth $21 per share in cash to McDermott shareholders.

328.    CB&I shares closed on May 10, 2018, immediately prior to the Merger, at $16.39 per share. For each share of CB&I, the holder thereof received 0.82407 of a McDermott share in the Merger. According to the Proxy Statement (at *xiii*), approximately 102.5 million shares of CB&I common stock were outstanding as of March 26, 2018. Thus, the market value of the McDermott shares issued to CB&I shareholders on May 10, 2018, approximated $1.75 billion (a 0.82407 conversion ratio multiplied by a $20.70 per share market price multiplied by 102.5 million shares).

329.    In light of these and other facts as alleged herein, the Defendants, McDermott's CEO and CFO did not disclose the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge, in the alternative, is imputable to Defendants, given the implication of core

115

operations, the Defendants' roles and status within McDermott, both generally and as specifically regards the Merger and the Four Focus Projects.

330.    Defendants signed, were quoted in, or SOX certified the alleged misstatements.

331.    As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, the Defendants were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully. As alleged herein, they violated such duties.

332.    As the individuals who SOX certified SEC filings as described above, the Defendants were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them. As alleged herein, they violated such duties.

### 4.    *The Fraud Violated McDermott's Corporate Code of Conduct*

333.    McDermott's Code of Conduct, published on its website, barred all the misconduct detailed above.

334.    In a section captioned "Integrity of Records and Accounting Procedures," the Code of Business Conduct *required* accurate reporting of the company's operations, expressly including accurate measurements of progress to date and forecasts of cost on large construction projects like the Four Focus Projects. For instance:

> We create documents and records in the normal course of business to assist in our decision-making process and to document our compliance with laws, regulations and Company policies and procedures. ***All entries in the Company's books, records and accounts must be complete, accurate and fairly reflect our business transactions conforming to applicable accounting standards and legal requirements.***

> Whatever your part in this process, you are required to be honest and forthcoming - if a transaction or payment cannot be accurately documented without raising legal questions or embarrassing the Company, the transaction should not be consummated and the payment should not be made.

All of the Company's records, from your expense account forms to the Company's annual report must accurately reflect the facts. ***In most of our construction operations we report financial results and are compensated on a percent-of-completion basis and may be paid by our customers on a milestone basis. This requires an accurate measurement of progress to date and an accurate forecast of cost to complete, as that has a direct impact on the earnings reports filed by the Company and reported to the SEC and the Company's shareholders.*** Corporate funds and assets must be recorded according to Company procedures. False or misleading entries are unlawful and will not be tolerated. No one may establish undisclosed or unrecorded funds or assets for any purpose. Except for normal and customary petty cash funds, which are strictly controlled, cash transactions are not allowed.

\* \* \* \*

***All Company records and documents must be accurately and honestly created and maintained, and all accounts and reports must fully reflect all relevant facts. This is Company policy and it is the law.*** In following these requirements, activities such as embezzlement, money laundering and ***holding "off the books" cash or slush funds are prohibited.***

335.   McDermott's 10-K filings which directed investors to where the Code of Business Conduct was posted on the Company's website, stated, "We have adopted a Code of Business Conduct for our employees and directors, including, specifically, our chief executive officer, our chief financial officer and our other executive officers. Our code satisfies the requirements for a 'code of ethics' within the meaning of SEC rules. A copy of the code is posted on our Web site, www.mcdermott.com/ under 'Ethics-Code of Business Conduct." This language made clear that the Code of Business Conduct governed the Defendants' conduct at issue, which they knew and understood, inasmuch as they signed and SOX-certified those Form 10-K filings.

336.   Defendants' flagrant violation of express corporate policy further buttresses the inference of Defendants' scienter, whether based on their knowledge or their recklessness.

## V.    NO SAFE HARBOR

337.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any statements were labeled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to CB&I's and McDermott's then-ongoing misconduct as alleged herein, including without limitation with respect to the Merger and the Four Focus Projects. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

338.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable, because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by one or both of the Defendants or an executive officer of McDermott who knew that those statements were false when made.

339.    For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

340.    In addition, to the extent Defendants' statements are determined to be ones of opinion, they were materially false and misleading because (i) they were either not believed by the Defendants and were objectively false and (ii) because McDermott's shareholders, including Plaintiffs,  expected not just that Defendants believed the opinion (however irrationally), but that it fairly aligned with the information in their possession at the time. However, Defendants'

statements did not fairly align with the information in their possession at the time such statements were made, and they omitted material facts about Defendants' knowledge of the true state of the facts, including, *inter alia,* the true facts concerning Defendants' due diligence and understanding of the status of risks of the Focus Project prior to the Merger, and post-Merger, Defendants' understanding and representations as to the Focus Projects, their valuation and necessary accounting, and their true financial impacts on McDermott. True facts were known to Defendants or recklessly disregarded by them and conflicted with what a reasonable investor would take from Defendants' statements.

## VI.    THE CLAIMS ARE TIMELY

341.    The claims set forth herein were timely filed.

342.    Plaintiffs' Securities Exchange Act claims against Defendants are brought within two years of Plaintiffs' discovery of the fraud asserted herein.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

343.    The market for McDermott and for CB&I shares was open, well-developed, and efficient at all relevant times. As detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated McDermott's share price and operated as a fraud or deceit on purchasers of McDermott shares by misrepresenting the material facts as detailed herein. Defendants' false and misleading statements about the Merger and the purportedly advantageous consequences of a business combination between McDermott and CB&I also artificially inflated the pre-Merger price of shares of CB&I.

344.    As detailed above, when Defendants' prior misrepresentations became known to the public, through a series of corrective disclosures, the price of McDermott shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases of CB&I shares during the pre-Merger Period (which shares were converted into McDermott shares as a result of the Merger)

and their purchase of McDermott shares after the Merger, Plaintiffs suffered economic loss, *i.e.,* damages, under the U.S. federal securities laws.

345.    Defendants presented a misleading picture of McDermott's due diligence, financial condition, revenues, performance, and prospects of a business combination between McDermott and CB&I, including without limitation as regarded the Four Focus Projects. Defendants' false and misleading statements had the intended effect and caused CB&I shares to trade at artificially inflated prices during the pre-Merger Period and caused McDermott shares to trade at artificially inflated prices until the truth was fully revealed to the market.

346.    In response to the issuance of partially corrective disclosures on October 30, 2018, February 13, 2019, and July 29, 2019, and September 18, 2019, the price of McDermott shares sharply dropped, on high volume, as detailed herein, thereby removing inflation from the price of McDermott shares, causing real economic loss to Plaintiffs and investors who had purchased McDermott shares.

347.    The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline in McDermott shares negate any inference that the loss suffered by Plaintiffs was caused by changed market conditions, macroeconomic factors or McDermott-specific facts unrelated to Defendants' fraudulent conduct.

348.    The economic loss, *i.e.,* damages, suffered by Plaintiffs was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate McDermott's share price and the subsequent significant decline in the value of McDermott shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  PRESUMPTION OF RELIANCE

349.  At all relevant times, the market for McDermott shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)    McDermott met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "MDR", a highly efficient and automated market;

(b)    McDermott had approximately 284,032,088 million shares outstanding as of February 16, 2018, and, post-Merger, 180,796,580 shares outstanding as of February 21, 2019, such that its stock was liquid. Numerous shares of McDermott stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for McDermott stock and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, McDermott filed periodic public reports with the SEC;

(d)    McDermott regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    McDermott was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.

(f)    Unexpected material news about McDermott was rapidly reflected and incorporated into McDermott's stock price.

350.  As a result of the foregoing, the market for McDermott shares promptly digested current information regarding McDermott from all publicly available sources and reflected such information in the price of its stock. Under these circumstances, all purchasers of McDermott stock

suffered similar injury through their purchase of McDermott stock at artificially inflated prices and a presumption of reliance applies.[4]

351.   Alternatively, Plaintiffs are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah* v. *United States,* 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their statements in violation of a duty to disclose such information, as detailed above

## IX.   PLAINTIFFS' ALLEGATIONS

352.   As alleged herein, Plaintiffs will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public misrepresentations or failed to disclose material facts; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of the securities of CB&I and McDermott; and Plaintiffs purchased or otherwise acquired McDermott common stock (or CB&I stock, in anticipation of its conversion into McDermott stock) between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

## X.   CLAIMS FOR RELIEF

### COUNT I

### (For Violations Of Exchange Act
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

353.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

---

[4] Criteria determinative of market efficiency are likewise applicable to CB&I shares during the pre-Merger Period.

354.   This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

355.   Defendants, together with and through non-party McDermott, engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and did: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of CB&I and McDermott securities; and (iii) cause Plaintiffs to purchase or otherwise acquire McDermott common stock and notes (and, during the pre-Merger Period, to acquire CB&I stock in anticipation of its conversion into McDermott stock) at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

356.   Pursuant to the above plan, scheme, conspiracy and course of conduct, the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, teleconferences with analysts and investors, and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for McDermott securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about McDermott's due diligence concerning CB&I and about the operations, finances and business prospects of a business

combination between McDermott and CB&I, including without limitation with respect to the Four Focus Projects.

357.    Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at McDermott, and intended thereby to deceive Plaintiffs, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

358.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order preserve their positions and compensation at McDermott and to personally benefit from the consummation of the Merger and the sale of McDermott securities.

359.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein. As senior managers and/or directors of McDermott, who among other things oversaw the due diligence into the Merger, the Merger, and the post-Merger operations of the Four Focus Projects, Defendants had knowledge of the details of McDermott's operations, business, and internal affairs, including without limitation those regarding the Merger and the Four Focus Projects.

360.    Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did,

directly or indirectly, control the content of the statements of McDermott. As officers and/or directors of a publicly-held company, Defendants had a duty to disseminate timely, accurate, and truthful information with respect to McDermott's businesses, operations, financial condition and prospects, including without limitation as regarded the Merger and the Four Focus Projects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of McDermott securities was artificially inflated.   Because of Defendants' concealment of the adverse facts concerning McDermott's business, operations and financial condition, including without limitation those regarding the Merger and the Four Focus Projects, Plaintiffs purchased or otherwise acquired McDermott common stock (or, during the pre-Merger Period, CB&I stock, in anticipation of its conversion into McDermott stock)  at artificially inflated prices and relied upon the price of McDermott's securities, the integrity of the market for those securities and/or upon statements disseminated by Defendants, and were damaged thereby.

361.   McDermott common stock was traded on an active and efficient market. Plaintiffs, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of McDermott (or, during the pre-Merger Period, shares of CB&I stock, in anticipation of its conversion into McDermott stock) at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs known the truth, they would not have purchased or otherwise acquired said shares or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs, the true value of McDermott stock was substantially lower than the prices paid by Plaintiffs. The market price of McDermott stock declined sharply upon public disclosure of the fraud alleged herein, to the injury of Plaintiffs.

362.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

363.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases, acquisitions and sales of McDermott's common stock, upon the disclosures that McDermott had been disseminating materially misstatements and omissions to the investing public.

## COUNT II

### (For Violations Of
### Section 20(a) Of The Exchange Act)

364.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

365.   Defendants participated in the operation and management of McDermott, and conducted and participated, directly and indirectly, in the conduct of McDermott's business affairs. Because of their senior positions, they knew the adverse non-public information about McDermott's business, operations, finances, and prospects, and through their pre-Merger due diligence and post-Merger oversight, that knowledge extended to and included without limitation the adverse non-public information about CB&I's business and the Four Focus Projects.

366.   As officers and/or directors of a publicly owned company, the Defendants had a duty to disseminate accurate and truthful information with respect to McDermott's business, operations, financial condition, results of operations, and prospects, including without limitation those related to the Merger and the Four Focus Projects, and to correct promptly any public statements issued by McDermott which had become materially false or misleading.

367.   Because of their positions of control and authority as senior officers and directors, Defendants were able to, and did, control the contents of the various reports, press releases and public filings which McDermott disseminated in the marketplace concerning McDermott's business, operations, financial condition, results of operations, and prospects, including without limitation those related to the Merger and the Four Focus Projects. Defendants exercised their power and authority to cause McDermott to engage in the wrongful acts complained of herein. Defendants, therefore, were "controlling persons" of McDermott within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of McDermott stock.

368.   Each of the Defendants, therefore, acted as a controlling person of McDermott. By reason of their senior management positions and/or being directors of McDermott, each of the Defendants had the power to direct the actions of, and exercised the same to cause, McDermott to engage in the unlawful acts and conduct complained of herein. Each of the Defendants exercised control over the general operations and business of McDermott and possessed the power to control the specific activities that comprise the primary violations about which the Plaintiffs complain.

369.   By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by McDermott.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs hereby demand judgment against Defendants as follows:

A.      Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

B.      Awarding the Plaintiffs prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

C.      Awarding such other and further relief as this Court may deem just and proper.

## XII.   DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 17, 2020

Respectfully submitted,

 /s/ Joshua L. Hedrick

**Joshua L. Hedrick**
Texas State Bar No. 24061123
Southern District No. 2907845
**HEDRICK KRING, PLLC**
1700 Pacific Avenue, Suite 4650
Dallas, Texas 75201
Phone: (214) 880-9600
Fax:     (214) 481-1844
Josh@HedrickKring.com

Of Counsel:

Sigmund S. Wissner-Gross
**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4930
Fax: (212) 938-2804
swissnergross@brownrudnick.com

*Pro Hac Vice Motion to be submitted*

**ATTORNEYS FOR:**

KINGSTOWN CAPITAL MANAGEMENT, LP
KINGSTOWN PARTNERS MASTER LTD.
KINGSTOWN PARTNERS II, L.P.
KTOWN, LP
KINGFISHERS, LP
KINGSTOWN 1740 FUND LP